# Anderson *v.* The State.

*Indictment for Murder.*

<div style="float:right">79   5<br>117   41<br><br>79   5<br>139   77<br><br>79   5<br>138   37</div>

1. *Dying declarations; when admissible.*—On the facts shown in this case, the declarations of the deceased were made under a sense of almost immediate death, from the effects of a wound which he had received, and which caused his death during the same night; and they were properly admitted as dying declarations, although partly made in answer to a question asked him.

2. *Same; memorandum of.*—The admissibility of dying declarations is not affected by the fact that the witness testifying to them, made a written memorandum of them, which was not signed by the deceased, nor read over to him; nor is it necessary to produce the memorandum, though the witness may refer to it to refresh his memory.

3. *Threats by defendant; admissibility as evidence.*—Threats made by the defendant the day before the homicide with which is charged, though not naming the deceased or any other• person—as, "that they were in a row, and *he would kill some of them before night*, if they did not let him alone"—are competent and admissible as evidence against him, and it is for the jury to determine, in connection with all the evidence in the case, whether they in fact had reference to the deceased.

4. *Acts or conduct of defendant before homicide; relevancy of.*—The conduct of the defendant, a few hours before the killing, in taking his brother aside, and talking to him privately, is admissible evidence against him, "as one link in the chain of circumstances intervening during the several hours immediately prior to the killing;" it being shown that the homicide was perpetrated with a gun, that the brother owned a gun, and that the defendant was seen, on the evening before, coming from the direction of his brother's house, and carrying a gun.

[Anderson v. The State.]

FROM the Circuit Court of Cherokee.

Tried before the Hon. JAMES AIKEN.

The defendant in this case, Peter Anderson, a freedman, was indicted for the murder of Tom Davenport, another freedman, by shooting him with a gun; was tried on issue joined on the plea of not guilty, convicted of murder in the first degree, and sentenced to the penitentiary for life. On the trial, he reserved a bill of exceptions to several rulings of the court on the admissibility of evidence, which are the only matters here presented for revision. It was shown that the deceased was shot one night in October, 1885, and died from the effect of the wounds, during that night, or the next day; that while sitting in his house, with some members of his family, a noise was heard out in his horse-lot, and he went out to see what was the matter; that he called for his gun, as some of the witnesses stated, and immediately a shot was heard; that when his wife and daughter, with several others, got to him, they found him lying on his face, shot in the back, bleeding profusely, and groaning, and carried him into the house. His wife testified: "He said he was not going to live long." Gilbert Beatty testified : " He did not say anything out at the lot, either before or after he was shot. . . He said he was suffering, and was going to die; that he was shot, and could not live long; did not say anything about who shot him." Anderson Jones testified : " When I went out there, he was lying on his face; when he heard my voice, he called me, and said he was going to die —that he had a death-load in him, and would not get over it. When I went down to him, he said, '*Peter certainly have shot me,*' *and that he saw Peter behind a post-oak tree in the lot.*" To the admission of these declarations of the deceased, the defendant objected, and duly excepted. Squire Roe, a witness for the prosecution, testified : " I live about a half mile from the defendant. I saw Tom Davenport after he was shot, about 11 o'clock that night; and I saw the wounds after his death. I don't remember hearing him say anything about dying. I saw him the next day about 10 o'clock. He was groaning mightily; was not spitting up blood. He said he could not live long in that fix, but nothing more that I now recollect; said nothing about dying, that I recollect. Henry Howell said to him: '*Tom, we have come to see if you know who shot you; you can't live long.*' Deceased replied, '*I can't live long in this fix;*' " and he made a statement, which was reduced to writing. The defendant objected to the statement made by said Howell, and to the answer of the deceased; and he also objected to any oral statement by the witness, of that which was taken down in writing; which several objections were overruled by the court, and the defendant excepted. The witness,

[Anderson v. The State.]

continuing, said : " Mr. Howell asked him who killed him, and he replied, '*Pete Anderson*.' He said he heard a noise down at the horse-lot, and went down there ; and just after he called for his gun, and turned, looking toward the house, Pete shot him." The defendant moved to exclude this evidence from the jury, and duly excepted to the overruling of his motion. The written statement was not produced. This was, in substance, all the evidence adduced as to the several dying declarations.

Mrs. W. Hickman, a witness for the State, thus testified : " Defendant passed through our yard the day before the shooting. He said, *they were in a row*—did not say who—*and if they did not let him alone, he would kill some of them before night*." The defendant objected to this evidence, and moved to exclude it from the jury ; and he excepted to the overruling of his objections. There was no proof of any former difficulty or quarrel between the defendant and the deceased.

James Anderson, a brother of the defendant, was examined as a witness for the State, and testified : " I own a shot-gun. It was in the house where I lived, at the time the deceased was shot. Nobody had it. I was working at Mr. McHugh's. Henry Barnett came there that night ; had been out possum-hunting. They stayed a while." T. H. Ward, the next witness for the State, testified : " I saw defendant the evening before Tom was killed. He was going towards home, and was coming from the direction in which James Anderson lived. He had a gun. It was between sundown and dark." Henry Barnett, a witness who had testified to dying declarations made by the deceased, as above stated, further testified : " I met defendant, the night Tom Davenport was killed, about one mile and a half from where he lived, going towards home. He had nothing. This was after dark, tolerably early in the night. I went with him to Mr. McHugh's, and we stopped there a quarter of an hour. I went on towards Howell's ; don't know which way Pete went. Pete took his brother aside, and talked to him." The defendant objected to this last statement of the witness, and moved to exclude it from the jury ; and he duly excepted to the overruling of his objection and motion. The witness added : " I did not hear what he said to his brother. I was five or six steps from him at the time. It was just after dark when I saw him."

Walden & Son, for the appellant.

Thos. N. McClellan, Attorney-General, for the State.

Somerville, J.—We think it clear that the predicate

was sufficient to authorize the admission of the dying declarations of the deceased. He was fatally wounded by being shot with a gun, from the effects of which he immediately fell to the ground. He lay there perfectly helpless, bleeding profusely from his wound, and spitting blood frequently. He was discovered, in a few minutes after the report of the gun was heard, and was suffering with great pain, and groaning heavily. He declared that he was going to die on the spot where he had fallen—that he "had a death-load in him, and would not get over it,"—that he "was not going to live long." The shooting was done about 11 o'clock at night, and the death of deceased ensued the same night, so far as we can infer from the evidence in the record.

There can be little or no doubt of the fact, that the deceased, at the time of making these declarations, believed that he was at the point of death—that the surrounding circumstances, in other words, impressed him with a sense of almost immediate dissolution. The declarations were, therefore, admissible, and it was immaterial that one of these statements was elicited by an inquiry propounded to the declarant.—1 Greenl. Ev. §§ 156–158; *Reynolds v. State*, 68 Ala. 502; *West v. State*, 76 Ala. 98; *Kilgore v. State*, 74 Ala. 1.

The fact that a written memorandum was made of such dying declarations, did not preclude the right to prove them by oral evidence. It is not shown that this statement was read over to the deceased, or signed by him. It was a mere memorandum of what was said, not in itself original evidence, but competent only to be referred to by the witness who made it, for the purpose of refreshing his memory.—1 Greenl. Ev. (14th Ed.) § 161; *Com. v. Haney*, 127 Mass. 455.

The threat shown to have been made by the defendant on the day before the killing, as testified to by the witness Hickman, was properly allowed to go to the jury, although it was of a general character, and menaced no person definitely designated. It may have had reference to the deceased, and this was a question to be determined by the jury, in connection with the other facts in evidence.—*Jones v. State*, 76 Ala. 8; *Ford v. State*, 71 Ala. 286; *Harrison v. State*, 78 Ala. 5.

We see no error in admitting the testimony of the witness Barnett, as to the conduct of the defendant, a few hours before the deceased was killed, in taking his brother aside, and talking to him privately, when they met at McHugh's. The evidence showed that the brother owned a gun, the kind of deadly weapon with which the homicide in question was perpetrated, and that defendant was seen coming from the direction of his brother's house, the evening before the killing, carrying a gun. This evidence was admissible, as was said in

[Jordan v. The State.]

*Ford's case*, 71 Ala. 396, " as one link in the chain of circumstances intervening during the several hours immediately prior to the killing," which tended to interpret his conduct.

We discover no error in the record, and the judgment is affirmed.