THE STATE v. HARLAN.

Division Two, November 19, 1895.

1. **Criminal Practice**: JUROR: NEW TRIAL: WAIVER. The competency of a juror will not be reviewed on appeal where no objections are made to him in the motion for a new trial.

2. ———: MURDER: EVIDENCE. On a trial for murder it appeared that shortly after a quarrel between defendant and deceased began, defendant and a witness had a conversation out of the hearing of deceased, and defendant offered to show by such witness that he promised the witness that he would have no further difficulty with the deceased, but the evidence showed that he immediately left the witness and renewed the difficulty, and was the aggressor until the killing occurred. *Held*, that it was not error to exclude such offered testimony, especially as defendant testified fully, without objection, to the desired conversation, and as the conversation between the witness and deceased just prior thereto was excluded on defendant's objection.

3. ———: ———: ———: THREATS. Evidence that defendant stated, before the homicide, that he would get square with someone before night, is not inadmissible because of vagueness; that fact being for the consideration of the jury.

4. ———: ———: ———: ———. Where the defendant unequivocally denied the foregoing statement attributed to him, it was not error to refuse to permit him to state that if he had used such language he had no reference to deceased.

5. ———: EVIDENCE, OBJECTIONS TO. An objection to evidence without assigning any reasons therefor is insufficient.

6. ———: EVIDENCE: MURDER. The state can not, on a trial for murder, be required to produce as a witness every one who saw the homicide.

7. ———: ———: MANSLAUGHTER. The evidence in this case *held* not to authorize an instruction on manslaughter.

*Appeal from Howard Circuit Court.*—HON. JOHN A. HOCKADAY, Judge.

AFFIRMED.

*Th. N. Williams, W. S. Pope*, and *I. W. Boulware* for appellant.

(1) The court erred in overruling defendant's objection to the competency of Mr. Ives, who was accepted as one of the panel of forty persons from whom the jury was selected. (2) The court should have permitted the witness to testify to his conversation with defendant after the deceased left the cabin and the wheelhouse of the boat. (3) The court erred in admitting the testimony of witnesses Niewedowsky and Holt as to the conversation had in Jefferson City with defendant; it had no reference to the deceased or to any anticipated trouble with him. (4) The court should have permitted defendant to testify that any conversation he had with Niewedowsky and Holt had no reference to deceased. (5) The court should have required the state to produce as a witness Esau Carter, who saw the homicide. *Rex v. Simmonds*, 1 C. & P. 84; *Rex v. Whillbread, Ibid.* 84. (6) The court erred in restricting its instructions to the two degrees of murder and in not instructing on manslaughter. Nor was it necessary for defendant to request such instruction. *State v. Stonum*, 62 Mo. 596.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, and *W. M. Williams* for the state.

(1) The court did not err in its rulings on the evidence. The evidence as to the threats of defendant, testified to by the witnesses Holt and Niewedowsky, was competent. *State v. Crawford*, 99 Mo. 74. (2) The court did not err in excluding the alleged conversation of defendant with witness Noble. *Com. v. Gray*, 30 S. W. Rep. 1015. (3) The court did not err in refusing to instruct on manslaughter, there being no evidence to reduce the grade of the offense below murder. Besides the failure to instruct on manslaughter was not assigned for error in the motion for a new trial. See *State v. Cantlin*, 118 Mo. 100; *State v. Brewer*, 109 Mo. 648. (4) The state was not required to call Esau Carter as a witness. *State v. Eaton*, 75 Mo. 586; *State v. Johnson*, 76 Mo. 121.

GANTT, P. J.—The defendant was indicted by the grand jury of Callaway county, at the May term, 1894, for the murder of Charles Moore, on February 27, 1894. He was duly arraigned at the same term and entered a plea of not guilty. He applied for and a change of venue was granted to Howard county. He was tried and convicted of murder in the second degree at the March term, 1895.

The deceased, Moore, lived in Jefferson City and was the owner of a farm on the opposite side of the Missouri river, in Callaway county. Defendant Harlan lived near that farm. On the day of the killing, Moore had been down the river on the Callaway side to his farm, and was returning home on horseback. Defendant Harlan had been to Jefferson City and was returning to his home in the Callaway bottom, east of

Jefferson City. Harlan and another party were traveling in a buggy. The deceased, Moore, came up from the east and was going west, in the direction of the ferryboat. A. J. Trambarger, a witness for the state, and a negro named Lewis Murry were at work getting out driftwood about a mile or three quarters of a mile below the ferry, and near Trambarger's house. Moore stopped to talk to Mr. Trambarger. While he was talking there, the defendant, coming from the direction of the ferryboat, drove up in his buggy.

The witness Murry states that defendant said to Moore, "Charley, I want to see you." Both he and Trambarger testify that hot words passed between them. Moore said to defendant, "You are drunk," or "He is drunk," or words to that effect, and rode off at a fast gait toward the ferry. The defendant jumped out of his buggy and called to the deceased to come back, and said that he could whip the deceased, and that if he kept on meddling with defendant he would do it, and added, "I believe I will follow him to the boat," or, "I will follow him and whip him." The deceased paid no attention to him, but went rapidly on toward the boat. When defendant said that he believed that he would follow him and whip him, Mr Trambarger, to whom the remark was addressed, said: "Mr. Harlan, I would defer it," and defendant answered, "I believe I will take your advice." He got into his buggy and turned around and started in the direction of the ferryboat.

The boat, at the time, was lying at the bank on the Callaway side. The deceased went immediately to the boat and rode his horse onto the left-hand side of the boat and hitched him to the bull rail. Deceased then went up the stairs on the left-hand side of the boat, on the side opposite the Callaway shore, into the cabin. Mr. Noble, the clerk of the boat, was in the

cabin reading at the time.   There were two stairways leading into the cabin, one on each side of the wheelhouse; and at the top of each stairway, and before reaching the door entering the cabin, is a landing of five or six feet, and a person going into the cabin upon one side of the wheelhouse would be in full view of anyone on the other side of the wheelhouse in front of the door of the cabin.   The wheelhouse at that point is only three and one half feet higher than the stairway. The defendant followed the deceased on up to the boat, driving rapidly, and got out of his buggy, leaving it on the bank, and went on the boat.   The deceased went into the cabin and there had a conversation with witness Noble.   This conversation was excluded when offered by the state, upon objection made thereto by defendant.

A very short time after Moore went into the cabin the defendant was heard coming up the steps on the south or left-hand side of the boat into the cabin. Moore went out of the cabin door on the opposite or the north side of the boat, as it was then lying.   They then went in full view of each other, but on opposite sides of the wheelhouse.   The defendant had just come up the steps on the south side leading into the cabin, and the deceased had just gone out the north door and was starting toward the steps on that side of the wheelhouse.

Noble testifies that, after he, the witness, got out to where the parties were, the deceased was the first to make a remark.   He said to defendant: "I want you to quit following me and let me alone.   The defendant said: "I am not going to hurt you; I want you to prove what you said.   You said I was drunk, and, by God, prove it."   Some words followed between them. The defendant said that he didn't think that deceased

had treated him right.    There were some sacks in question, and the name of Mr. Shearer was mentioned. Defendant Harlan said he did not think that Moore had treated him right, after what he had done for him. Deceased said: "You never did anything for me but that you were well paid for it." After some other conversation defendant said: "You have accused me of being drunk, and I want you to prove it. I will leave it to Capt. Kay, or Mr. Coulter, or my young friend here" (meaning the witness Noble, who was the only other witness besides the deceased and the defendant, upstairs on the boat). The witness Noble declined to decide it, and, after some further controversy, defendant said that if deceased would come down stairs they could settle it—could settle their trouble in a short time. The deceased replied this: "No, I am not going down stairs; I am on the defensive;" and the defendant said, "Defense, hell," or something to that effect. Defendant said to the deceased, "You are a coward." The deceased made no reply. This witness further stated that he got Mr. Harlan by the hand presently, and took him inside the door of the cabin. Moore, in the meantime, went down the north stairway, went around to the front of the boat, and picked up a stick of wood and walked along the south side of the boat. Defendant Harlan went into the cabin with the witness Noble.

The defendant's counsel asked this witness to state the conversation that took place in the cabin between him and the defendant after the deceased had gone down stairs. This conversation between the defendant and Noble was not in the presence of the deceased. The court sustained an objection on the part of the state to any testimony as to this conversation between the defendant and said witness. Thereupon defendant stated that he proposed to prove that after Harlan went into the cabin of the boat, witness Noble told him that

he ought not to have any further trouble with the deceased; that he said enough to him; that they were both old men and had families, and that both were grayhaired men, and that they could not afford to have a controversy of that kind, and that defendant replied: "Young man, your advice is good, and I will take it." And that thereupon Mr. Noble said: "Give me your hand on that, Charley," and that he gave Mr. Noble his hand, shook hands with him, and told him he would have no further controversy with Mr. Moore, and said to Mr. Noble: "You know that when I give my hand on a thing I mean it just that way." And that this occurred immediately after the controversy between Mr. Moore and Mr. Harlan, and was a continuous conversation between the time Mr. Harlan began and Mr. Harlan and Mr. Moore parted, or was out of the witness' sight. The court asked the witness whether this conversation proposed to be proved by the defendant was in the presence and hearing of the deceased, and the witness answered that it was not. The court then, upon the objection of the state, excluded the testimony.

The state then proved that after defendant had remained a short time in the cabin, probably from two to five minutes, he went down the south stairway of the boat. Moore was then on the south side of the boat. As Harlan went down the steps Moore was some distance from the rear end of the boat, where the steps landed, and was walking along with a stick of cord-wood in his hand. He was walking along with it as a shepherd would carry his staff. When defendant got into a position where he could see the deceased, the defendant said: "You son of a bitch, put down that stick." The witness Noble could not say whether the defendant was at the head of the stairs, or was coming down the steps, or had got to the bottom, when

he made that remark, but he thought it was at the foot of the stairs; that the first he saw of the deceased, the deceased was starting to run, or to move backward or sideways, to get away, going up toward the engine house door; that defendant walked up toward deceased and was demanding of him to put down the stick; that deceased was continually backing away from defendant and saying that he would not put it down; that Moore was backing all the time, and Harlan was demanding of him`to put down the stick; that Moore held the stick in several different positions during the time.

The evidence further showed that Moore backed off from the defendant along the south side of the boat, and then crossed the bow of the boat and then down the north gangway about ten feet beyond the gateway or apron, by which parties entered and left the boat on the north side. They were then six or seven feet apart. The defendant Harlan was still demanding of the deceased to put down the stick, and the deceased was saying he would not do it; that he meant to defend himself. Defendant said, "Put that stick down," and deceased said, "I will not; I mean to defend myself with it." Harlan said, "Yes you will." And the witness Noble adds, "He kinder turned his side to me," and witness saw a revolver in his right-hand pocket, and then he saw the flash and heard the report, and Moore staggered and fell against the bull-rail and was afterward carried up stairs into the cabin, and in a short time died of the wound received from this shot.

Captain Kay testified that after Harlan came down the steps from the cabin, he first saw Moore, near the bow of the boat; that Harlan demanded that he put down the stick, and that the deceased answered that he didn't want to be run over like a dog, and that he wanted the stick to defend himself with. He was

asked, "what was Moore's appearance at the time of the shooting," and he answered that "The deceased had the manner of a frightened man. He did not have a mad look at all." The defendant objected to this answer, and moved to have it stricken from the record. No reason is assigned for this objection in the bill of exceptions. The objection was overruled and defendant excepted. The witness Kay also testified to the shooting substantially as stated by the witness Noble, whose testimony is given above.

George Coulter was also a witness to the shooting. He says that it took place on the north side of the boat, when the deceased and the defendant were about six feet apart; that Moore was about ten or fifteen feet east of the north gangway or apron that goes off of the boat; that they both came up there; that Moore had the stick in his hand and Harlan demanded of him to put the stick down, and Moore said he wanted it to defend himself, and that he didn't want to be run over like a dog, and that deceased stepped back about six feet, and defendant drew his pistol and shot him; that deceased was holding the stick with both of his hands about the time of the firing of the shot, and that he thought the end of the stick was pointing down.

David Waters was the fireman on the boat. He states, in substance, that the first he saw of the disturbance was when Harlan and Moore were at the left-hand corner of the boiler house, and Moore was walking back with a stick in his hands on his shoulder, and Harlan was following him up; that Moore was walking backward around in front of the boiler house, and Harlan was following him; that they were some three or four feet apart at the time; that Harlan was telling Moore to put down the stick, and Moore told him he would put down nothing, that he was tired of being run over; that Moore was then back on the

gangway on the right-hand side, some eight or ten feet probably, and Harlan was some four or five feet from him; that Harlan pulled his pistol and shot, and Moore ran around on the right-hand side. He stated on his cross-examination that deceased had the stick over his shoulder from the time that the witness saw him; that he never put the stick down from the striking position in which he held it over his shoulder, from the time that the witness first saw him until the shot was fired. Moore died a few minutes after he was shot, from the effects of the wound.

John Holt, a witness for the state, testified that between 11 and 12 o'clock on the day of the shooting, which took place about 4 in the afternoon, the defendant went into a saloon in Jefferson City, took a drink and bought a bottle of whisky, and said that he didn't know that he would buy any more; that he would get even with somebody before that night; or that he would be square with somebody. He did not mention the name of the deceased.

H. M. Niewedowsky, a witness for the state, was asked if he heard any statement by the defendant on the day of the killing and prior thereto at a saloon in Jefferson City. The defendant objected to this question, but the reason of the objection is not contained in the bill of exceptions, and no reason is assigned therefor. The objection was overruled and defendant excepted. The witness testified that he heard the defendant say, "I will get square with some son of a bitch before night." The defendant asked the court to strike out all of the testimony of the witness, but no reason is assigned therefor. The court overruled the motion and the defendant excepted.

At the conclusion of the state's evidence the defendant moved the court to require the prosecution to introduce Esau Carter, colored, who was an eyewitness

to the killing, so that the defendant might have the opportunity of cross-examining him as the state's witness. This the court declined to do, and the defendant saved an exception to this ruling.

Esau Carter was then introduced in behalf of the defendant. He stated that he saw deceased have a stick in his hand, and that the defendant stepped up to him and told him to put the stick down; that the witness turned to get away from there, and pretty soon thereafter heard the shot fired, and then the deceased came by him, and went up the stairs; that when he heard Harlan tell Moore to put down the stick and Moore told him he was not going to put it down, witness thought there was going to be trouble; that Moore had the stick up; that sometimes he had it up and sometimes down; that the shot was fired two or three seconds after he turned his back; that Moore came down the stairs on the side next to the bank, or north side, and that the next the witness saw of him, he had the stick and was walking up and down the boat on the south side; that Harlan had not then come down stairs; that Moore was walking up and down there nearly a minute; that Harlan stepped up to Moore and told him to put down the stick, and said, "If you hit me with that stick you are a dead man;" that "Moore commenced to back off, kinder;" that defendant told Moore to put down the stick near a dozen times; that before Harlan came down stairs, while Moore was walking up and down the boat, sometimes he was looking up and sometimes looking out into space or looking down; that he did not strike Harlan with the stick and did not try to do so; that he was backing away and that Harlan was following him. He pointed out on a model of the boat, which was exhibited to the jury, the position of the parties.

The defendant testified on his own behalf. Up to the time he left the cabin and went down the stairs on the boat it contains no material contradiction of the state's evidence. He then details the circumstances attending the shooting in these words:

"I went in the cabin a few minutes, and then went on down stairs on this side through here and went up this stairway and went in the cabin door there, and Mr. Noble was in there, and I came down the stairway and as I got to the foot of the stairway and turned I saw Mr. Moore here, with a big club in his hand. It was unexpected to me. I was astonished; and I made the remark, 'Here is the damn rascal now.' Realizing the danger I was in, and seeing him in the passage way with the club in his hand, I shifted my pistol from my hip pocket to my front pants pocket, and turned to him and said, 'What are you doing with that club?' or 'What are you going to do with that club?' And he said, 'I am going to defend myself.' And I said 'You have no use for a club to defend yourself against me. I don't want to have any trouble with you, go and put the stick down and let me alone, I have just promised Mr. Noble that I would not have any further trouble with you, and I gave him my hand, and you know, Charlie Moore, that when I give my hand I mean it.' That is the very thing. He didn't attempt to raise the club then, and I looked him straight in the eye, and walked up close to him, and was talking to him as I advanced, and I took hold of his left arm with my right hand, and was talking with him and walking along. I told him it was all uncalled for. We had not had any serious difficulty and I had not done him any harm. We had not had any real fuss. That was about the purport of my conversation with him, and for him to go off and let me alone and to put the club down. And in front of the

engine house, about here (indicating) he jerked away from me; I was not holding him tight, and he jerked away and drew the club this way (indicating), and that was when I first realized I was in a very dangerous position. I then put my right hand on my pistol and said, 'If you attempt to strike me with the club you are a dead man,' and looked him right in the face. He dropped the club. He just drew it up this way (indicating), and I remarked that and he dropped the club on the point of his shoulder in this position (indicating). And I talked to him and told him to go off and let me alone and put that club down, and he started to raise it again, and I could tell from the gleam of his eye and expression of his face, and as he started to raise the club again I fired."

"*Q.* Why did you fire that pistol? *A.* Because I knew he was going to strike me with the club he had in his hand. It was a very large club, four feet long, or about, I suppose, and was cord-wood length. It was a green hickory stick considerably bigger than my wrist."

The court instructed the jury as to murder in the first degree and murder in the second degree and the law of self-defense, and gave the usual instructions in such cases. The defendant asked a number of instructions, part of which were given by the court, and several of which, being covered by other instructions, were refused. The jury returned a verdict of murder in the second degree, and assessed the defendant's punishment at ten years in the penitentiary.

The defendant, in due time, filed a motion for a new trial, assigning four grounds therefor. The first is, that the court gave improper instructions at the instance of the state; the second, that proper instructions asked by the defendant were refused; the third, because the court permitted improper evidence to go

to the jury; and the fourth, because the court excluded proper evidence from the jury. This motion was overruled and the defendant excepted. The court sentenced the defendant in accordance with the verdict of the jury to ten years' imprisonment in the penitentiary. He obtained a stay of execution, and has brought the case to this court by appeal.

I. The objections to the competency of the juror Ives urged in the brief can not be considered in this court. No such error was alleged in the motion for new trial.

II. The exclusion of the defendant's statement to the witness Noble after the deceased Moore had left the cabin and gone down stairs is made the ground of an exception. It is clear that the deceased had left the cabin and did not hear the conversation, and the uncontradicted evidence shows that if defendant did say to Noble, as he offered to prove, that he would have no further quarrel with deceased, but would go home, he immediately left the cabin and as soon as he came into view of deceased he at once renewed the difficulty and was the aggressor throughout. So that, without questioning the ruling of the circuit court, it is evident that no error was committed in excluding the evidence when the conduct of the defendant immediately consequent upon his promise is considered. Moreover, he testified fully to that conversation when on the stand without objection, and his counsel succeeded in excluding all the conversation between Noble and the deceased just prior to defendant's coming into the cabin.

III. It is also assigned as error that the circuit court improperly permitted the state to show the threats testified to by John Holt and N. M. Niewedowsky. No objection was made to the evidence of Holt at the time, and, of course, it can not be made here for the first time. Moreover, the objection now urged is not

tenable. This threat was made on the forenoon of the day of the homicide. Its vagueness was a matter for the jury to consider, but it was competent. *State v. Crawford*, 99 Mo. 74.

No reasons are assigned in the bill of exceptions for the objections to Niewedowsky's evidence. The general objection is insufficient. *State v. Moore*, 117 Mo. 395.

Defendant having denied unequivocally that he had made the statements attributed to him by these two witnesses it was not error for the court to refuse to permit him to state that if he used these expressions he had no reference to deceased.

IV. The defendant moved the court, after the state had closed its case, to require the state to introduce Esau Carter, whom the defendant claimed was an eyewitness to the homicide. The court denied the motion and its action is assigned as error. The circuit court was correct. We will not again open the discussion as to the right of the defendant to demand of the state that it shall be required to offer every one whom the defendant claims was a witness to a crime. We are entirely satisfied with the reasoning of the learned judge in *State v. Eaton*, 75 Mo. 586, upon this proposition.

V. There was no error in declining to instruct upon manslaughter in any degree. There was no evidence upon which to base any instruction for any grade of homicide less than murder. No instruction for manslaughter was asked by defendant, nor is it assigned as error in the motion for new trial that the court erred in not fully instructing the jury as to the law of the case save as to the specific instructions refused and given.

Without extending this opinion by discussing each instruction at length it is sufficient to say that the

instructions asked by the defendant which were correct were refused simply because the court of its own motion had already given them in substance, and the instructions drawn on the theory that defendant had in good faith withdrawn from the controversy were fully covered in a most favorable instruction given for the state.

The court gave instructions on self-defense exceedingly favorable to defendant. Indeed, upon a review of the whole record we are impressed that defendant was accorded a fair and impartial trial and that the evidence fully justified the jury in finding him guilty. The judgment of the circuit court is affirmed. SHERWOOD and BURGESS, JJ., concur.