# TERRITORY OF NEW MEXICO, Appellee, v. WILLIAM HALL, Appellant.

### SYLLABUS BY THE COURT.

HOMICIDE—SELF-DEFENSE—THREATS.—In a trial for homicide, where the question whether the prisoner or deceased commenced the encounter which resulted in death is in any manner of doubt, evidence of uncommunicated general threats of violence made by deceased a few hours prior to the homicide against any one found in a certain situation, is admissible where there is any evidence of a hostile demonstration against the prisoner by the deceased at the time of the homicide, the deceased finding the prisoner within the scope of said threats; and where there is evidence tending to prove that within a year prior to the homicide there had been communicated to the prisoner numerous threats made against his life by deceased.

*Appeal* from the District Court of Chavez County, Fifth Judicial District.   Reversed and remanded with directions.

Facts are stated in the opinion.

FREEMAN & CAMERON, attorneys for appellant.

EDWARD L. BARTLETT, Solicitor General, for appellee.

CRUMPACKER, J.—Appellant, William Hall, was in the district court of the Fifth judicial district of the Territory of New Mexico, within and for the county of Chavez, on the fifteenth day of March, 1899, by indictment charged with the murder of one C. A. Crump, and upon his trial on March 28, 1899, was convicted of murder in the first degree and sentenced to death.   The case is brought here on appeal.

The important undisputed facts in the case are, that shortly before day-break on the morning of January 8, 1899, the appellant, a gambler by profession, while in a state of sobriety,

visited a colored prostitute, named Pearl Johnson, at her brothel, which was a tent, situated in the south part of the town of Roswell; that within fifteen minutes after he arrived there and while sitting on the bed engaged in removing his shoes, the deceased, who "kept" the prostitute, and whose mistress she confessed herself to be, in a state of intoxication, knocked on the outside, or screen door of the tent; that the prostitute thereupon called out to the deceased that she had company, whereupon deceased "jerked the screen door open, it being fastened by a hook over a nail" and pushed open a second or wooden door, which was closed and unlocked, and entered; that the light in the tent was dim; that four or five shots were fired in the tent, one passing directly through the deceased's body on a line with the heart, and either one or two between the eyes, ranging downward, and one over the right eye, the range of which was not stated, another bullet finding a lodgment about eighteen inches to the right of the door where the deceased had entered; that deceased, appellant, and the witness, Pearl Johnson, were the only persons present at the scene of the homicide; that deceased was killed by the appellant; that immediately after the killing appellant left the place and gave himself up to the authorities, and that the witness, Pearl Johnson, moved the body of the deceased from the inside to the outside of the tent and remained at the tent until persons attracted by the shooting came upon the scene.

The prosecution, to establish its theory of the case, was compelled to rely absolutely upon the truth of the testimony of the witness, Pearl Johnson, whose account of the tragedy differs from the appellant's in all important particulars from the moment deceased jerked open the screen door and entered the tent. She testified that after deceased had knocked and she had replied that she had company, deceased jerked the screen door open and entered, one hand being at his mouth holding a cigarette and the other hand hanging by his side, when appellant jumped up from the bed where he had been sitting, and with his pistol in hand asked deceased "what he broke the door in on him for;" that deceased replied, "I didn't

break it in, it was already open," and that appellant with an oath said to the deceased, "I have paid to stay here for the day and the best thing you can do is to go back to town;" that deceased replied, "All right and asked Hall (appellant) for a match;" that Hall said he had no match and that witness then got up from her bed to get Crump (deceased) a match, with which he lighted his cigarette; that Hall then asked Crump if he had a gun, and after Crump replied, "No, you are welcome to search me," that Hall searched him for a gun, but did not find any; that Crump smiled during the search; that Hall then caught Crump by the lapel of the coat and began to curse him; that Hall turned Crump loose again and Crump told Hall he had the best of him and invited him to go down town where he would get a gun and make him throw his in the river; that Hall replied he didn't want to have any trouble with him at her house; didn't want people to say he had trouble at her house; that Crump again said "all right, come down town and he would get a gun and make him throw his in the river;" that they then stood facing each other for a few minutes; that they both moved about the same time; that Hall had fallen back towards the stove, that Crump also moved from the door towards the stove, that "Crump told him that he had his gun, but he acted a damned s-of-b- about it, then Will (Hall) shot him; after he shot Crump I ran out; in going out I had to run by Crump; he was between me and the door;" that Hall aimed his second shot at her as she was going out the door; that while she remained outside three more shots were fired in the tent; that she returned to the tent and found Hall sitting astride the body of Crump and saw him strike Crump once in the face with the handle of his pistol; that she asked Hall not to strike him again, when Hall got up, put on his coat, told her to quiet her nerves, not to give him away and thereupon left. In corroboration of this witness the prosecution introduced testimony tending to show that no pistol or weapon was found on the deceased after the killing; that the shots which took effect in the head, ranged downward through the bones of the face, that the probable effect of any one of the

shots entering deceased's body was to cause instantaneous paralysis, that there were bruises on the face and that appellant was physically the superior of the deceased.

The appellant stated the facts as follows: "Somebody knocked; I did not know at the time who it was; he said, 'open the door,' she (Pearl Johnson) told him she had company; he said, 'To hell with your G-d- company; who is it;' I told Pearl not to let him know who it was; she said it is Will Hall; he jerked the screen door open on the outside and he kicked the other one open and as he came in he run his hand in here (indicating) and caught hold of his gun and was pulling it and said, 'You big s-of b-, I have got you at last,' I pulled my gun and shot him; when I heard him breaking in I was sitting on the edge of the bed and I got up as quick as I could and he come right on in and I stepped sort of around back of the bed and shot at him twice as he came on at me. The light was dim and the smoke blinded me for a minute or two, he then crowded me down to the foot of the bed and I am not certain whether I struck at him twice; I know I struck him one good lick on the face with my gun and knocked him back, then when I knocked him back, it looked like he kind of squatted down and I shot at him twice more; did not shoot at him any time after had an opportunity of knowing he was fatally wounded; did not strike him after he was down; put my gun in the scabbard and left; Pearl Johnson was down on the floor screaming, talking to the deceased, saying, 'Oh, my darling,' going on; the only words he spoke when he came in that door was, 'You big s- of b- I have got you at last,' that was the only conversation that passed between us; at the time I fired I thought sure he would kill me." Appellant also testified to a number of occasions when he and Crump had had difficulties while gambling; that several times Crump had come to appellant's gaming table, created a disturbance and pulled his gun, "once punched around with his gun in my money, throwed the money around on the table, told me he was going to shoot my right eye out," that deceased had cursed appellant and on at least seven different occasions within a year prior to the homicide

had threatened to kill appellant; that he feared deceased on account of the threats he had made; that he knew deceased on the night of the homicide had had a quarrel with witness, Pearl Johnson; that he did not think deceased would return to her place that night and that he did not expect to meet him there. Of the witnesses introduced by the defense six testified to threats made to them by deceased against appellant, all of which were communicated to appellant, and two offered to testify to threats made by deceased shortly before the homicide when about to go to Pearl Johnson's tent, that "if he found any one there, he would jump the s— of b— out;" "that he wanted to catch some s— of b— there; that he would kill the first s— of b— he caught there," which were uncommunicated. The defense sought also to explain the range of the shots by showing that deceased was in a stooping position at the time he was shot in the head, and by medical experts that it was within the bounds of possibility that the shots entering the deceased's body did not cause instantaneous paralysis; that the fact that no weapon was found on deceased, was not conclusive proof that he did not possess one at the time of the killing, and pointed out in argument that while he is shown by the evidence introduced by the defense to have possessed his weapon on the day prior to the homicide, yet his weapon was never found or accounted for at all by the prosecution. Appellant was also corroborated by witness, Pearl Johnson, as well as by his own witnesses as to the fact of the deceased's quarrel with Pearl Johnson earlier on the night of the homicide. Evidence was also introduced by the defense tending to show that deceased was of a quarrelsome disposition, habitually carried a weapon, and was armed on the night of the homicide.

A preliminary question arose respecting the imperfect condition of the transcript of record filed in this court, and at a former session of the present term a motion of appellee to strike out certain portions of the purported record in this cause, upon the ground that such portions were not properly incorporated in the record by bill of exceptions, was in part sustained; leaving

for our consideration now only the record proper, the questions saved by the bill of exceptions set out at pages 61 to 64 of the transcript, and the testimony admitted and offered upon the trial with the rulings of the court thereon. Appellee's motion to strike out was directed perhaps with equal force against this testimony, but we then decided, since it is properly authenticated and a human life is at stake, to consider it as incorporated in the bill of exceptions referred to, wherein it was referred to as attached thereto; but its admission under the grave circumstances of this case, is in no wise to be regarded as a settled rule of practice binding upon this court in other cases.

Upon the record thus reduced we find appellant complains of the ruling of the trial court in excluding certain testimony. By J. L. Danley it was proposed to prove that deceased had at about one o'clock a. m. of the night of the homicide stated to witness that, "he (deceased) said he was going to see his nigger baby; he said he wanted to catch some s— of b— there, that he would kill the first s— of b— he caught there, and patted himself on the right hip, and stated he had his some forty odd in his pants to do it with." Upon this offer the court ruled that that portion of it with reference to the forty some odd and that he patted his hip pocket was relevant and excluded the balance of the statement on the ground that it was not a specific threat pointing to the appellant; by Mark McClenney (witness referred to as Mark Clamy in brief) it was proposed to prove that very shortly before the homicide— "It was along just before daylight," is the language of the witness,—witness had a conversation with deceased, wherein deceased said, "he was going down to Pearl's to stay the rest of the night;" that witness told him "to come on back and play monte;" that he wanted to get even with him, and further said, "you are liable to find somebody down there anyway," to which deceased replied "I will jump the s— of b— out," and went off. This testimony the court excluded, as stated in the record, "because it in no manner is shown that the fact of the difficulty between the deceased and his paramour, Pearl

Johnson, was communicated to defendant by the witness, and because it does not rise to the dignity of a threat and in any event it could not be construed as being directed against the defendant, following Carr v. State, 23 Neb. 749." An examination of the case cited reveals the fact that it has no bearing whatever upon the case at bar. The threats referred to in that case and excluded from the evidence were threats made by the defendant prior to the murder, to kill or injure some other person than the deceased; and the court in that case go so far as to say about such threats that the testimony might have been competent if introduced upon the part of the plaintiff in error, for the purpose of showing his condition prior to the killing, but that it knows of no rule which would permit the State to prove threats against persons other than the deceased for the purpose either of proving an intention to kill deceased, deliberation, premeditation or malice. The exclusion of the testimony confronts us with the most important question that can arise in this case. From a fair summary of all the evidence it appears that at the time these statements were alleged to have been made by deceased, the appellant and deceased were gamblers and rivals in business in the same town; they were also rivals for the affections of the negro prostitute. The deceased had been drinking and carousing during the night; he had gone with his mistress to her tent at about two o'clock in the morning and later returned to a gambling house exhibiting scratches on his face, and told in a crowd, where it was overheard by appellant, that he had "whipped the damned nigger;" but several hours later he proposes to return to her, and on being reminded that he might find some one there, he starts for her cabin declaring his intention "to kill the first s— of b— he caught there." Arriving at the tent he jerks open the screen door, pushes open the other door, enters and unfortunately finds there the one man for whom above all others he entertains great enmity. Numerous threats of deceased's sinister designs had been theretofore communicated directly to appellant by deceased as well as indirectly through friends or acquaintances of the appellant, and the only

other person present at the scene of the homicide was the self-confessed mistress of the deceased. The tragedy is enacted. The appellant attempts to justify the homicide by a plea of self-defense, and the pivotal question becomes: Who was the aggressor in the conflict? What are the lights which illumine this point? From the standpoint of the Territory, only the testimony of the witness, Pearl Johnson, with certain seeming corroborating circumstances. From the standpoint of the defense, appellant's testimony, the numerous threats against the appellant's life which deceased had made to appellant and to others during a period covering nearly a year immediately prior to the homicide, and most particularly such threats, though uncommunicated to defendant, made only a few hours before the homicide.

Assuming that the threats were not inadmissible upon other grounds, we conclude in view of the peculiar facts of this case that the vagueness of the language used by the deceased constitutes no sufficient ground for its exclusion, but that it was a matter for the consideration of the jury from which they were to determine whether or not the language should be construed as threats made against the appellant. Territory v. Pratt, 10 N. M. 138, 61 Pac. 104; State v. Harper, 44 S. W. 273; State v. Tatter, 37 Pac. 54, 26 Oregon 38; State v. Calvins, 76 Mo. 355; State v. Crawford, 99 Mo. 74; Brown v. State, 105 Ind. 392; State v. Harland, 130 Mo. 381; 32 S. W. 997; State v. Fitzgerald, 32 S. W. 1117; Benedict v. State, 14 Wis. 460; Hodge v. State, 26 Fla. 11; State v. King, 9 Mont. 445; Harris v. State, 11 So. 255; Hopkins v. Com., 50 Pa. 9; Harris v. State, 16 So. 360; State v. Cushing, 53 Am. St. R. 883, 14 Wash. 527; Bessetti v. State, 101 Ind. 185.

Homicide: self-defense: threats.

There are a few cases which hold that threats to be admissible for any cause must be shown to have been communicated to the accused, and others which hold that uncommunicated threats are not admissible unless they constitute a part of the *res gestae;* but the more modern and better rea-

soned cases favor the admission of such evidence in the following instances: (a) to show who began the affray; (b) to corroborate evidence of communicated threats, and (c) to show the attitude of the deceased. Certainly, this rule is limited to those cases where there is proof of a hostile demonstration by the deceased at the time of the killing, showing a present intention to carry out his purpose. Therefore, to sustain the ruling of the court below, it must appear from the record that there is no evidence in the case to show any hostile movements or attitude of the deceased toward the accused at the time of the firing of the fatal shots, and that there is conclusive evidence to the contrary. In support of this position the Territory must rely solely upon the testimony of the witness, Pearl Johnson, the only witness of the meeting which resulted in the death of deceased, and the falsity of the testimony of the appellant. If we are to believe implicitly all that is here said by such a witness as Pearl Johnson, we do not see in it conclusive evidence that the appellant was the aggressor and that no previous hostile demonstration was made by the deceased. On the contrary, she says, as we have seen, that after she had informed deceased that she had company, deceased "jerked open the screen door, which was fastened," pushed open the second door and walked in; that appellant said to deceased that he had paid to stay and the best thing he could do was to go back to town; that he told deceased he didn't want to have any trouble with deceased at her house; that they (appellant and deceased) stood looking at each other for a few minutes; that they were face to face, and, quoting the testimony, "I think they both moved about the same time. Q. Which way had they moved? A. Will (appellant) moved to the south part and Crump (deceased) moved in this direction of the house (indicating). Q. Hall (appellant) had fallen back toward the stove? A. Yes, sir. Q. Crump was standing at first immediately inside the door? A. Yes, sir; standing just inside of the door. Q. He didn't move back toward the door? A. No, he moved back to the east part of the house. Q. Didn't he move closer to the stove? A. Yes, sir; they

were all close to the stove. Q. What else took place before Hall fired? A. They stood looking at each other for a few moments, and Crump told him that he had his gun, but he thought he acted a damned s— of b— about it, and then Will shot him." From the testimony it appears that the dimensions of the tent were estimated to be from north to south fifteen feet and from east to west twelve feet, and all the witnesses testifying on the point by their testimony and diagrams locate the door at which deceased entered in the north side of the tent slightly nearer the west than the east side of the tent, and the stove in the southeast corner of the tent. Considering all the facts contained in the record, we think the court had no right to assume that because there was no direct proof aside from the testimony of appellant of any attack by the deceased, it was beyond doubt that appellant was the aggressor and commenced the assault which ended in the death of deceased; but it was the right of the appellant to have this testimony weighed and passed upon by the jury. Wharton in his work on Criminal Law, section 1027, says: "When the question is as to what was deceased's attitude at the time of the fatal encounter, recent threats may become relevant to show that this attitude was one hostile to defendant even though such threats were uncommunicated." This testimony might, in the state of mind produced upon the jury by the other evidence in the case, have turned the scale in favor of appellant. At all events, we are of opinion that in that condition of things it was relevant to the issue, and should have been admitted. Wiggins v. People, etc., 93 U. S. (3 Otto) 465; State v. Cushing, 53 Am. St. R. 883 (14 Wash. 527) ; State v. McNally, 87 Mo. 644; Stewart v. State (Texas), 35 S. W. 987; Brown v. State, 105 Ind 392; Bell v. State, 66 Miss. 192; Rohrs v. State, 68 Ala. 156; Davidson v. People, 4 Colo. 145; Keener v. State, 18 Ga. 194, 63 Am. Dec. 269; Wharton Crim. Law, Vol. 1, Sec. 64; Little v. State, 6 Bart. 493.

As for the reason above stated, the judgment in this case should be reversed, we do not deem it necessary to discuss other alleged errors growing out of the record, which are of

such a nature as preclude the probability of their reoccurrence upon a retrial of the case. The cause is, therefore, remanded with directions to grant a new trial; and it is so ordered.

Mills, C. J., Parker, J., and McFie, J., concur.

---

[843. August 24, 1900.]