## STATE *v.* CANAK

No. 3024

April 30, 1934.                    31 P. (2d) 1033.

*W. L. Hacker, J. M. Frame* and *Seward J. Parks,* for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews,* Deputy Attorney - General; *Julian Thruston,* Deputy Attorney-General; *Melvin E. Jepson,* District Attorney; and *A. P. Johnson,* Deputy District Attorney, for the State:

## OPINION

By the Court, COLEMAN, J.:

The defendant, Steve Canak, was convicted of murder, and has appealed from the judgment and the order denying his motion for a new trial.

In this opinion we will refer to appellant as defendant, as he was designated in the trial court.

The defendant has assigned five errors, the first of which reads as follows: "It was error for the trial court, over defendant's objections, to admit in evidence the testimony of Mary Canak and Dan Canak, the same being incompetent, irrelevant, immaterial and collateral to any issue or issues in the case, because the same did not prove or tend to prove any issue in the case and was introduced only for the purpose of prejudicing the defendant before the jury. See Transcript, pp. 9, 10, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39."

1. This assignment of error is very general, and would justify a demand for a more specific assignment. There is much testimony on the pages mentioned to which there cannot be the slightest objection, and to

which no objection was made during the trial. Furthermore, if the trial court erred in some of its rulings, the error was cured by the introduction by defendant on cross - examination of Mary Canak of her testimony taken at the preliminary hearing, wherein she gave the same evidence. State v. Johnny, 29 Nev. 203, 87 P. 3. However, we will consider what we consider the only debatable question raised by the objections and rulings of the court, appearing in the pages of the transcript mentioned.

Mary Canak testified to her marriage to defendant in 1914; to their being divorced in 1926; to the fact that they had four children as issue of the marriage; to her subsequent marriage to another man, and her divorce from him; to her owning the house and lot where the homicide was committed; to the fact that she had built several cabins on the lot, which she rented; to the fact that for years she had kept roomers and boarders, among whom was Mike Rakich, whom defendant admitted killing about 2 o'clock p. m. on November 17, 1932, by striking him on his head with a twenty-inch rasp; that about four months before the killing she permitted defendant, who was out of employment, to occupy one of the cabins. She also testified that shortly before the killing, defendant came upon her back porch, where she was working, and went on into the house; that as he came in he said "Hello" to deceased, who was in the back yard making a bench, and who responded, "Hello"; that as defendant went into the house he asked her to come into the room which he entered, as he wanted to talk to her. We quote from her testimony as follows:

"A. He says come I want to talk to you. I say I no got no time. You no got nothing to do. 'Mary, really you don't like me any more?' I say, 'No. You think I like you yet' and he says, 'Sure I think you like me yet.' I said 'Steve no don't you think I got lots of trouble with you.' 'Mary, you will be sorry.' I don't know why how you treat me 'Mary, you will be sorry, and it don't

be long.' He say you don't scare Mary. I say I don't know why be scared. I speak again, but I never look at him before, and he say, 'You don't scare.' I hang my head like that (indicating) and look at him.

"Q. And looked at him? A. Yes. When I see his face just like paper, white just like paper, red eyes just like blood. He used to keep his hands in both pockets. He keep both hands in both pockets. Then I was scared though. Back way I go, my screen door. I told him you want to see Steve who you scare."

The witness further testified that two months prior to the killing defendant pulled a knife "between family"; that he said on the day of the homicide, "Even if I try to kill daughter and son, I never mean kill you."

This witness testified that after the conversation between her and defendant she left the house by the back door and went across the street to a neighbor's to call the police; as she went down the porch steps the deceased was making a bench about 15 feet distant, and that the rasp with which deceased was killed was lying on the ground near the steps.

No testimony was offered to the effect that any enmity was known to exist between defendant and the deceased. The deceased was killed while Mrs. Canak was trying to call the police. There were no eyewitnesses to the affair.

Dan Canak, the 18-year-old son of Mrs. Canak and defendant, a high school student, testified that the deceased had boarded and roomed at his mother's house from time to time for several years, and that prior to his being killed he had been there for two or three months; that the defendant was jealous of his mother's boarders and roomers and did not want them around.

The defendant testified that he was born in Jugo Slavia and was 49 years old; that he had been in this country thirty-one years, and that he knew deceased in the old country; that he had never had any trouble with deceased before; that he had known

him in this country four or five years; that they had been friends always, and he had never had words with him; that, when Mrs. Canak left him, he came out of the house and went over to where the deceased was. He then testified as follows:

"A. When I come to Mike I said, 'How is she going,' and Mike answered me, 'You going to pay me for Dracovich now.'

"Q. When he said that to you, what did he do? A. He had that same rasp in his right hand.

"Q. And what did he do? A. As soon as he says that to me, 'You going to pay me for Dracovich now,' he tried to hit me with the rasp.

"Q. And what did you do? A. So I catch the rasp in here (indicating), and took it away from Mike. When Mike or I got the rasp he got excited, then they turned around himself. He tried to get something else.

"Q. When he done that what did you do? A. Why, of course I stopped him then.

"Q. Did you strike him? You struck him with this rasp, did you? A. Yes, I have to protect myself.

"Q. Did you intend to kill him? A. No, sir.

"Q. At the time that you struck him with this rasp, did you believe that you were in danger? A. Why sure I believe I was too.

"Q. And do you know exactly how many blows you struck him? A. I believe I struck him three times.

"Q. Do you know for sure whether it was three times or more? A. I think I am sure it is not more than three. When I hit him third time I knocked him down."

He also testified that deceased was a bigger man than he and that deceased made a hard blow at him with the rasp and that he caught it in his hands. He testified that he had understood that deceased and Dracovich had had a fight and that deceased blamed him for the trouble.

The above statement will enable one to understand the situation and the merit of the assignment of error referred to.

It is the contention of defendant that the testimony of Mary Canak was improperly admitted, over objections, for the reason that it related to subjects not connected with the killing; that the threats testified to were not directed at deceased, were collateral and prejudicial, and inadmissible to prove any issue in the case.

Counsel cite certain cases in support of their contention that the evidence of threats on the part of the defendant was improperly admitted in evidence, but we do not think they are in point, since the situation presented by the facts of this case are very dissimilar from the facts in the cases cited.

2, 3. We think all of the evidence introduced on behalf of the state was properly admitted, including that pertaining to relations which had existed between the defendant and his former wife and children, and the conditions which existed at the time and preceding the homicide, on the premises of Mrs. Canak, for the purpose of showing the jealousy, passion, and feelings of the defendant on the day of the homicide and for some time prior thereto, and his intention, as manifested in his talk with Mrs. Canak a few minutes before he slew the deceased, when he said, "Mary, you will be sorry, and it don't be long."

The supreme court of Idaho, in State v. Larkins, 5 Idaho, 200, 47 P. 945, 946, in considering the propriety of admitting in evidence the following statement made by one charged with murder, a few hours before the homicide, to wit: "I would like to take you with me but I have a dirty piece of business to do tonight"— said: " * * * It tended to show the animus on the part of the accused towards deceased; and, further, the declaration of accused testified to by the witness De Kay tended to show an abandoned, reckless, malicious spirit on the part of the accused. This conclusion is supported by the following authorities: Jordan v. State, 79 Ala. 9; Anderson v. State, 79 Ala. 5; Harrison v. State, 79 Ala. 29; Dixon v. State, 13 Fla. 636; State v. Grant, 79 Mo. 113 [49 Am. Rep. 218]; State v. Hymer, 15

Nev. 49; Benedict v. State, 14 Wis. 423. The supreme court of Missouri, in State v. Grant, supra, says: 'Under the ruling in State v. Adams, 76 Mo. 355, the competency of threats made is not affected by their newness or remoteness, and the authorities cited for the state show that the threats made by defendant "against policemen" were admissible. Mr. Wills says: "It is not uncommon with persons about to engage in crime to utter menaces, or to make obscure and mysterious allusion to purposes and intentions of revenge, or to boast to others, whose standard of moral conduct is the same as their own, of what they will do, or to give vent to expressions of revengeful purposes, or of malignant satisfaction at the anticipated occurrence of some serious mischief. Such declarations or allusions are of great moment when clearly connected by independent evidence with some subsequent criminal action. The just effect of such language is to show the existence of the disposition from which criminal actions proceed, to render it less improbable that a person proved to have used it would commit the offense charged, and to explain the real motive and character of the action." Wills, Circ. Ev., top page 62. In Stewart's Case evidence was admitted that he had said that "he hated all the name of Campbell." 19 How. State Tr. 100. And vague threats, not against any particular person, have often been admitted, and are competent evidence. Rex v. Barbot, 18 How. State Tr. 1251; Benedict v. State, 14 Wis. 423. In a comparatively late case in this state a witness was allowed to testify that she heard the defendant say, a short time before the homicide: "I'll kill him before day, G——d d——n him," without calling any name. It was held admissible. State v. Guy, 69 Mo. 430.' "

In the case of People v. Craig, 111 Cal. 460, 44 P. 186, 187, wherein the defendant was charged with the murder of his wife on July 25, 1894, the court held it proper to permit testimony of a statement made in May of the same year, as follows: "Yes, sir; he said,—that is, while they (wife and children) were in San Francisco,— he said to me that there would be something happen

sure before it would end." In ruling upon the question, the court said: "It is contended on the part of the appellant that the court erred in admitting this testimony, for the reason that it had no tendency to show any ill will on his part towards his wife, and that upon his trial for her murder it was incompetent to prove ill will or malice on his part towards any other person. This testimony was competent, however, and properly admitted for the purpose of showing the intent of the defendant in killing his wife, and that he acted with malice aforethought. To establish this intent, it was competent for the prosecution to offer any evidence that would enable the jury to ascertain the state of his mind at the time of the killing, and this would be best evidenced by his acts and declarations at or about that time. If the conversation between the witnesses and the defendant embodied a threat on his part, it was proper that it should go before the jury for the purpose of establishing his feeling towards his wife, and determining whether he was actuated by malice. Whether it was of such a character as would authorize such an inference could be determined by the jury only after it had been given, and, while the weight to be given to the testimony was to be determined by them, its admissibility was to be determined by the court before it was known what the testimony would be. The indefiniteness of the threats was not a sufficient reason for excluding the testimony."

In State v. Butler, 96 Or. 219, 186 P. 55, it was held that a statement by the defendant made eight months before the homicide, in the following words, was admissible: "If I can't beat you fellows any other way, I will do it with a Winchester."

In Moore v. People, 26 Colo. 213, 57 P. 857, 858, a general threat was held properly admitted, the court quoting with approval the following: "Threats may be admissible, although they were not directed towards any particular person, * * * and they may not have been to commit any specific act or injury if they tend to show a malicious condition of defendant's mind."

In State v. Harlan, 130 Mo. 381, 32 S. W. 997, vague general threats were held competent.

BEATTY, C. J., in State v. Hymer, 15 Nev. 54, held that testimony to the effect that the defendant, three hours before the killing, stated, "It is the first time I have been drunk since I have been in town; I got drunk just to kill two or three s——s of b——s in this town to -night, and I'll do it too," was competent. In the course of his opinion he said: "It was for the jury to determine, from all the circumstances, whether this was mere idle vaporing or a correct expression of the defendant's state of mind. If it was the latter, and there was any circumstance from which they might infer that the deceased was one of the persons intended, it should express malice."

We think, too, the language of this court in State v. Larkin, 11 Nev. 314, is in point, wherein it said: "It is claimed that the court erred in allowing testimony as to the intimate and illicit relations existing between the witness Nellie Sayers and the deceased; also, as to the same relations between this witness and the defendant. 'An evil motive,' says Mr. Wills in his work on Circumstantial Evidence, 'constitutes in law as in morals, the essence of guilt; and the existence of an inducing motive for the voluntary acts of a rational agent is assumed as naturally as secondary causes are concluded to exist for material phenomena. The predominant desires of the mind are invariably followed by corresponding volitions and actions. It is therefore indispensable, in the investigation of moral actions, to look at all the surrounding circumstances which connect the supposed actor with other persons and things and may have influenced his motives.' (38.) The prosecution had the right to offer any evidence which tended to prove a motive in defendant for the commission of the crime, and this testimony was clearly admissible for that purpose."

Dean Wigmore lays down the following rule, which we think applicable under the facts and circumstances of this case: "It has been noted that the more specific a design is, the greater its probative value. There may

come a point at which the design is too indefinite in its indications to be of any probative value; but the mere fact that it is generic, i. e., points towards a class of acts, however broad, does not in itself destroy its relevancy, provided the purpose might naturally include the act charged." 1 Wigmore on Ev. (2d ed.), sec. 106.

In Underhill on Crim. Ev. (3d ed.), sec. 508, it is said: "Under certain circumstances the vague and uncertain threats of the accused may be shown to prove the condition of his mind at the time of the crime. This rule is applied to his declarations that he is going to kill somebody, without mentioning any names, or that he is going to make trouble, or that he is going to shoot someone, or similar indefinite threats which indicate that he is in an ugly frame of mind and disposed to commit some crime, though not the particular crime for which he is on trial."

4. It is next contended that the evidence wholly fails to sustain the verdict because there was no proof of malice, premeditation or deliberation, and, on the contrary, that it shows the defendant acted in self-defense. The trial court instructed the jury on these points, as to which there is no objection. The deceased was the larger man, and it is beyond belief that defendant could have taken the rasp from him so easily; and the slight laceration between the thumb and forefinger does not corroborate this theory. Furthermore, the defendant told the officers when arrested that he had had no trouble with the deceased. His idea of self-defense seems to have been thought of at a later period and when he found the evidence to the effect that he had slain the deceased too strong to overcome. The testimony of Mrs. Canak to the effect that when she left the house the rasp with which the killing was done was on the ground 15 feet from where used, if believed by the jury, as it evidently was, completely refuted the defendant's theory. Besides the testimony of the doctor that the deceased was hit on the head five times, either of which blows might have caused death, and his description as to the position, nature, and angle of the

wound, may, in the minds of the jury, have disproved the testimony of the defendant to the effect that he struck the deceased as he was going to get something with which to continue the assault. We cannot reverse the judgment for lack of sufficient evidence to sustain the verdict.

It is next contended that the district attorney was guilty of misconduct highly prejudicial to the defendant, in that he persisted in asking questions upon collateral matters. No particular question or questions are pointed out as constituting such prejudice in addition to those considered by us under the first assignment. No error was committed in this connection.

5. It is contended that, since the defendant offered no evidence on the question of his character, the state had no right to inject that issue into the case. No evidence was offered on the part of the state as to defendant's character. The testimony as to his threats was proper and was not offered to prove character.

Perceiving no prejudicial error in the record, the order and judgment appealed from are affirmed.