## THE STATE v. RICHARD FOLEY, Appellant.

### Division Two, February 19, 1913.

1. **INDICTMENT: Sufficiency: No Motion in Arrest: What Matters Considered.** The court on appeal will consider the sufficiency of the indictment though no motion in arrest was filed, but in doing so, in so far as pure matters of exception not contained in the record proper are concerned, it will consider only such assignments as are embraced in the motion for a new trial.

2. **FALSE PRETENSE: Indictment: Sufficiency.** A hard-and-fast form of indictment charging the obtaining of money by false pretenses is not to be expected; but measured by the statutes and tested by the adjudicated cases, the indictment set out in this case, charging that defendant, an employee in the city lighting department, by falsely pretending he owned and used a horse in his work of inspecting the city lights and by presenting an account for twenty dollars which the city ordinances allowed for a horse used in said work, and by said means obtaining said money, is sufficient.

3. ———: ———: **Pleading Ordinance.** Since the statute under which defendant was prosecuted for obtaining money from the city covers the false pretenses of all persons, whether officers or city employees or private persons, it was not necessary for the indictment to plead the city ordinance of the city under which he held the office of inspector of city lighting and by virtue of whose provisions he was put in a position to carry out the fraud.

4. ———: ———: **Within Knowledge of Officers Deceived.** If the false representations disclosed by the indictment were touching matters and things fully within the knowledge of the city

officers who are alleged to have been deceived thereby, it is fundamental that the indictment is bad; but where the ordinance allowed an inspector of the city lighting twenty dollars a month for a horse and vehicle when in the opinion of the supervisor they were necessary in the performance of the work, it cannot be said that the supervisor knew that defendant inspector did not have a horse, nor that he was not deceived by defendant's false representations that he did own and use a horse and buggy in his work, and the indictment is not bad on its face, since it was peculiarly within defendant's knowledge that he did not own a horse.

5. ———: **Sufficient Evidence: Credibility.** Where there is substantial proof, either direct or circumstantial, of every legal element of the offense and necessary to substantiate it as sufficiently charged, its weight and credibility is for the jury, and the court is precluded from further determining its weight.

6. ———: **Dismissal as to one Count: Tantamount to Acquittal on Others.** Where the first count of the indictment charged defendant with having obtained by false pretense and representations a "warrant of the value of twenty dollars," and the second count charged him with having obtained by the same means "twenty dollars, lawful money of the United States," a dismissal as to the first count does not operate as an acquittal under the second count. The two counts do not charge precisely the same offense perpetrated by the same identical means.

7. **VARIANCE: Must Be Raised in Trial Court.** The statute (Sec. 5114, R. S. 1909) requires that a variance between the proof and charge shall be called to the attention of the trial court, and unless that is done the point is not available on appeal.

8. **FALSE PRETENSE: Proof of Other Fraudulent Acts: Intent.** Where defendant was charged with obtaining twenty dollars in money from the city, in September, 1910, by false pretense, in falsely representing that he owned and used in his work as inspector of the city lighting a horse and buggy, the admission in evidence of other warrants and vouchers evidencing the obtaining by the same means of like sums from the city during other months is not prejudicial, but competent as showing the intent with which the particular act was done.

9. **CROSS-EXAMINATION OF DEFENDANT.** Defendant cannot complain of questions asked him on cross-examination if he opened the door to such questions by his direct examination, or if they were necessarily embraced in his examination in chief, though they were unnecessary and uncalled for. The State is not bound to follow categorically what was asked him on direct examination.

10.  INSTRUCTIONS: Conflicting: False Pretense.  An instruction
for the State telling the jury that if defendant had falsely rep-
resented that he owned a horse and buggy which he used in
the service of the city in inspecting light, they should find him
guilty, and an instruction for defendant telling the jury that
if in such work he used a horse and buggy belonging to others
this fully met the intention and spirit of the law and he should
go acquit, are not in conflict.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor,* Judge.

AFFIRMED.

*John A. Gernez* for appellant.

(1)  There was an entire failure of proof to sus-
tain the allegations of the second count.  (2)  The de-
fendant having a just claim against the city of St.
Louis, the fact that he enforced collection of the same
by alleged false pretenses is no crime.  People v.
Thomas, 3 Hill, 169; Comm. v. Duffy, 126 Mass. 467;
R. v. Williams, 7 Car. & P. 354; State v. Hurst, 11 W.
Va. 54; 2 Bish. Cr. Law (8 Ed.), sec. 466; Comm. v.
Henry, 22 Pa. St. 256; State v. Jamison, 37 Ark. 445.
(3)  The mere opinion expressed by the defendant
that the city was indebted to him, is not a statutory
false pretense.  2 Bish. Cr. Law (8 Ed.), sec. 1429;
State v. Johnson, 41 Tex. 65; State v. Webb, 26 Iowa,
262; State v. Heffner, 84 N. C. 751; People v. Jacobs,
35 Mich. 36.  (4)  The taking of the first count from
the jury by the court, as far as that count was con-
cerned, acted as an acquittal; and the essence of the
offense charged being the same in both counts, an
acquittal on the first count operates as a bar to a con-
viction on the second.  State v. Hess, 240 Mo. 147;
State v. Headrick, 179 Mo. 300; State v. Brotzer, 245
Mo. 499.  (5)  Proof of obtaining a "warrant" by
false pretenses does not sustain a conviction for ob-
taining by such pretense the sum of twenty dollars,

for which the warrant was cashed. State v. Mispagel, 207 Mo. 557; Comm v. Wood, 142 Mass. 459; Comm. v. Howe, 132 Mass. 256; People v. Goodhue, 94 Ill. 47; Comm. v. Harkins, 128 Mass. 79; People v. Lorey, 229 Ill. 268; State v. Schild, 159 Mo. 130; State v. Crosswhite, 130 Mo. 358; State v. Dodson, 72 Mo. 283; State v. Bacon, 170 Mo. 161; State v. Kroeger, 47 Mo. 530. (6) It was erroneous in the trial to admit evidence of witnesses, testifying: *a.* That they had seen defendant at times without a horse and buggy. It was incompetent and of no probative effect, and yet liable to bias and prejudice the minds of the jurors. *b.* The issuance of other vouchers and warrants than those charged in the indictment, because it was not shown that these had been issued by reason of any false pretenses, similar to those charged in the indictment. *c.* The so-called confession of the defendant, because the *corpus delicti* had not been proven. *d.* The improper cross-examination of defendant, cross-examination being permitted on matters that had not been gone into on direct examination, and which was entirely foreign thereto. State v. Grant, 144 Mo. 56; State v. Hathorn, 166 Mo. 229; State v. Kyle, 177 Mo. 659; State v. McGraw, 74 Mo. 573; State v. Turner, 76 Mo. 350; State v. McLaughlin, 76 Mo. 320; State v. Hudspeth, 150 Mo. 31. (7) The instructions given by the court of its own instance, and at the defendant's request, were inconsistent and diametrically opposed to each other.

*Elliott W. Major,* Attorney-General, and *Alex. Z. Patterson,* Assistant Attorney-General, for the State.

(1) The second count of the indictment, upon which conviction was had, is predicated upon Sec. 4565, R. S. 1909, and charges with certainty every fact which is legally essential to constitute the crime of obtaining money by false pretenses. Appellant filed motion to quash the indictment, urging as the first

and second ground of the motion the general grounds that each of the two counts failed to state any offense under the law and the Constitution and that each of said counts was too vague, indefinite and· uncertain to fully inform the appellant of the offense charged. It was further urged in the motion to quash that each of said counts was bad because while they alleged that appellant was. an inspector, "duly appointed and qualified and acting under and ·by virtue of the laws and ordinances of the· city," they failed to properly plead such municipal laws and ordinances. It is further urged in appellant's motion to quash that while both counts of the indictment charged certain false and fraudulent representations made "to the city of St. Louis, its officers, agents and servants," the counts should have been more specific as to the names and positions of such agents and servants and should have showed that they had jurisdiction over the matters complained of. These special grounds of appellant's motion may be answered at once. First, the allegations complained of were matters of inducement solely, and as such it was unnecessary for the pleader to describe them with that degree of minuteness and particularity which is required in setting out the material allegations which constitute the offense charged. State v. Mayberry, 48 Me. 218; Com. v. Reynolds, 14 Gray (Mass.), 87; Rex v. Wade, 1 B. & Ad. 861; Mason v. State, 55 Ark. 529; Bishop's New Crim. Proc. (4 Ed.), secs. 555, 3; Kelley's Crim. Law and Prac., sec. 189; 22 Cyc. 300. Second, these facts were facts peculiarly within the knoweldege of the accused, and it has been held that such facts may be averred generally. State v. McCormack, 2 Ind. 305; Rex v. Holland, 5 T. R. 607; 2 Hawkins, P. C. Co., 25; 22 Cyc. 306. It is sufficient to mention public officers as being such at the time without stating how they became such. Kelley's Crim. Law and Prac., sec. 189. (2) The motion for new trial alleges that the court erred in permitting the cir-

cuit attorney to go beyond the limits of the examination of appellant in chief, in his cross-examination. An examination of the record will show that appellant's direct examination amounted to a denial of the charge preferred and opened the subject of his guilt generally. The questions put to appellant in his examination in chief involved practically the whole issue tendered by the indictment, particularly the question, "Was there any time during that service that you didn't have a horse at your call and use?" Under these circumstances the State had the right to cross-examine him on these matters. Sec. 5242, R. S. 1909; State v. Miller, 190 Mo. 462; State v. Mitchell, 22 Mo. 683; State v. Keener, 225 Mo. 488; State v. Myers, 221 Mo. 598; State v. Miller, 156 Mo. 86. (3) The evidence was conclusive that appellant designedly, with intent to defraud, made the false pretenses alleged; that the city of St. Louis, through its officers, relied upon such pretenses and by reason thereof paid to appellant the sum of $20. All that is required is substantial evidence of guilt. The request to instruct an acquittal was properly denied. (4) Objection was made to the introduction of livery bills, bills for horse-shoeing, vouchers and warrants, on the ground that such evidence related to matters other than those set out in the indictment. On a charge for obtaining goods by fraudulent or false pretenses, acts of the defendant similar to the one for which he is tried, done about or near the same time, are admissible to show the intent with which the act charged was done. State v. Sarony, 95 Mo. 349; State v. Meyers, 82 Mo. 558; State v. Boyne, 88 Mo. 604; State v. Cooper, 85 Mo. 256. (5) Complaint is made in the motion for new trial that the instructions given were erroneous. Instruction 1 requires the jury to find from the evidence every element of the offense before returning a verdict of guilty. The term "feloniously" was correctly defined. State v. Brooks, 92 Mo. 553. Instruction 2 properly

limited the jury's consideration of the evidence of other false pretenses than those alleged to the showing of the intent with which appellant acted with respect to the property which is charged to have been obtained by false pretenses. Such instruction declared the law. State v. Sarony, 95 Mo. 349; State v. Meyers, 82 Mo. 558; State v. Byrne, 88 Mo. 604; State v. Cooper, 85 Mo. 256.

FARIS, J.—Defendant was convicted in the circuit court of the city of St. Louis on the second count of an indictment charging him with obtaining money from the city of St. Louis by certain false pretenses, and his punishment fixed by the verdict of a jury at imprisonment in the penitentiary for a term of two years. From the judgment and sentence imposed pursuant to said verdict, after the usual steps, he prosecutes this appeal.

The indictment against the defendant contains two counts, but the State having seen fit at some stage in the trial (but at what period is not clearly disclosed) to dismiss as to the first count, the same is not pertinent here, except insofar as it may incidentally bear upon matters of alleged error urged by defendant.

The second count, being that upon which the conviction was had, is as follows (caption omitted):

"And the grand jurors aforesaid, upon their oath aforesaid, further presentment make as follows:

"That Richard Foley on or about the thirteenth day of September, one thousand nine hundred and ten, at the city of St. Louis aforesaid, was an inspector of city lighting, duly appointed and qualified and acting under and by virtue of the laws and ordinances of the city of St. Louis, a municipal corporation; and that the said Richard Foley, inspector as aforesaid, on or about the said 30th day of September, 1910, at the city of St. Louis aforesaid, unlawfully and feloniously,

knowingly and designedly, with the intent then and there to cheat and defraud the city of St. Louis, a municipal corporation as aforesaid, did falsely and fraudulently, represent, pretend and state to the said city of St. Louis, its officers, agents and servants, that he, the said Richard Foley, inspector as aforesaid, owned a horse and buggy and had used the same in the city service during the month of September, 1910; and that the said city of St. Louis was then and there justly indebted to him, the said Richard Foley, inspector as aforesaid, in the sum of twenty dollars for furnishing and keeping a horse and buggy, which he, the said Richard Foley, as such inspector, used in the said city of St. Louis in performing his duties during the said month of September, 1910; and that he, the said Richard Foley, inspector as aforesaid, was then and there entitled to receive and have from the said city of St. Louis, the sum of twenty dollars for furnishing and keeping a horse and buggy and used by the said Richard Foley, inspector as aforesaid, in the performance of his duties as such inspector in said city of St. Louis during the month of September, 1910; and that the said city of St. Louis, its officers, agents and servants, believing the said false pretenses and representations so made by the said Richard Foley as aforesaid, to be true, and being deceived thereby, was then and there induced by the said false representations and pretenses so made as aforesaid, to pay over and deliver to the said Richard Foley, inspector as aforesaid, and did then and there pay over and deliver to the said Richard Foley, inspector as aforesaid, certain personal property, to-wit, twenty dollars, lawful money of the United States, in full payment and in discharge of said indebtedness of twenty dollars represented as aforesaid to be due and owing by said city of St. Louis to the said Richard Foley, inspector as aforesaid, and described as aforesaid, and that the said Richard Foley, inspector as aforesaid, by means of the said false

pretenses and representations so made to the said city of St. Louis as aforesaid, unlawfully, feloniously, knowingly and designedly did then and there obtain of and from the city of St. Louis said twenty dollars, lawful money of the United States, of the personal property of the said city of St. Louis, and of the value of twenty dollars, with the intent then and there the said city of St. Louis to cheat and defraud of the same.

"Whereas, in truth and in fact the said Richard Foley, inspector as aforesaid, did not on or about the thirtieth day of September, one thousand nine hundred and ten, own a horse and buggy and did not use the same to the city's service during the month of September, 1910; and

"Whereas, in truth and in fact the said city of St. Louis was not then and there justly indebted to him, the said Richard Foley, inspector as aforesaid, in the sum of twenty dollars for furnishing and keeping a horse and buggy, which he, the said Richard Foley, as such inspector, used in said city of St. Louis in performing his duties during said month of September, 1910; and

"Whereas, in truth and in fact the said Richard Foley, inspector as aforesaid, was not then and there entitled to receive and have from the said city of St. Louis the sum of twenty dollars, for furnishing and keeping a horse and buggy used by the said Richard Foley, inspector as aforesaid, in the performance of his duties as such inspector in said city of St. Louis during the month of September, 1910. All of which he, the said Richard Foley, then and there well knew.

"Against the peace and dignity of the State."

It is sufficient to say touching the first count, which, as stated, was dismissed, that it was in substance similar to the second count quoted above, except that the property in said first count charged to have been obtained by defendant was "a warrant of the city of St. Louis of the value of twenty dollars."

Both charges were bottomed on identically the same transaction.

Defendant challenged the sufficiency of the second count by a timely motion to quash, which motion the court overruled, defendant taking all proper exceptions. This motion to quash, omitting caption, is as follows:

"Said count fails to state any offense under the laws, statutes of Constitution of this State.

"Said count is too indefinite, vague and uncertain and fails to properly inform the defendant of the offense with which he stands charged.

"Said count is bad in that, while it alleges the defendant was an inspector, 'duly appointed and qualified and acting under and by virtue of the laws and ordinances of the city of St. Louis,' it fails to properly plead such municipal laws and ordinances.

"While the count charges that the defendant with the intent to cheat and defraud the city of St. Louis, did make certain false and fraudulent representations to 'the city of St. Louis, its officers, agents and servants,' the count should be more specific as to the name and positions of such agents and servants and show that they had jurisdiction over the matters complained of in the count.

"The count is bad, in that the representations claimed to have been made by the defendant are on matters fully within the knowledge of the city of St. Louis and its officers, servants and agents, having jurisdiction over the matters complained of and are not such as the city, its officers, servants and agents could have been deceived or mislead regarding to, and further, even if such representations were made, the city, its agents, servants and officers had no right to depend and rely upon such representations."

The testimony offered on the part of the State tended to prove the following facts:

That defendant was appointed night inspector in the city lighting department of the city of St. Louis on September 26, 1903, at a salary of $1200 per annum, payable monthly, and that he continued to hold this position until he was arrested on the charge at bar, about the 3d day of February, 1911. By the terms of an ordinance shown in evidence, providing for the employment of inspectors, such as defendant was, it was provided, among other things, that *"whenever in the opinion of the supervisor of city lighting a horse and vehicle shall be necessary for the proper discharge of the duties of an inspector, the same shall be kept and furnished by the inspector, who shall receive compensation therefor at the rate of $20 per month."* Among the duties incumbent upon the defendant as such inspector was to patrol the lighting district assigned him, from "lighting time" until half past ten at night; after this time he "rang in" and awaited calls. One McNamara and defendant were in the same district; each of them was on duty for twelve hours, but each of them was subject to call in case of emergency at any time, day or night, during the entire twenty-four hours. When defendant began work as night inspector he was instructed to provide himself with a horse and buggy, which he did, and for which he charged and was paid, pursuant to ordinance, at the rate of twenty dollars per month for some six years. But in June, 1909, defendant's horse became lame and worthless, as the result of a broken leg, and defendant thereupon sold him and subsequently seems not to have had a horse of his own.

The specific charge is based upon defendant's obtaining by certain alleged false pretenses, twenty dollars from the city of St. Louis for furnishing and keeping a horse and buggy for the month of September, 1910, which horse he did not have or furnish or keep, and which he had not had since June, 1909. On the 30th day of September, 1910, defendant presented to

State v. Foley.

the supervisor of city lighting of the city of St. Louis the following demand:

> City of St. Louis, lighting streets, alleys, parks and public places, for maintaining horses and vehicles.
>
> To Richard Foley, dr., for furnishing and keeping horse, etc., during the month of September, 1910, twenty dollars.
>
> I hereby certify that I own a horse and buggy and that I have used the same for the city's service during the month of September, 1910.
>
> RICHARD FOLEY.
>
> I hereby certify that the above account, amounting to twenty dollars, is correct and was necessary; and that I have at no previous time certified to same or any part thereof.
>
> R. E. FLOOD,<br>Chief Clerk, Supervisor City Lighting.

The above demand or certificate having been thereafter certified and approved by the board of public improvements, through its president, passed, in due course and custom of city business, through the hands of the city comptroller, the city auditor and the city treasurer. In the office of the city auditor there was thereafter issued and delivered to the defendant on the same day a paper, called by some of the witnesses a warrant and by others a voucher, which paper was in the following form:

CITY AUDITOR'S OFFICE.

No. 117.

COUNTERSIGNED Joseph Pasquier, Jr., 2nd Assistant Comptroller.

> St. Louis, Sep. 30, 1910.
>
> The Treasurer of the
> CITY OF ST. LOUIS.
>
> PAY TO THE ORDER OF Richard Foley $20.00
> Twenty and xx-100....................Dollars
> And Charge to the Account of
> Lighting Streets, Alleys, Parks
> and Public Places.
>
> Geo. B. Teasdale,<br>First Deputy City Auditor.

After the delivery of the above warrant or voucher to defendant he seems either to have been paid the amount thereof by the city auditor or to have taken the same to the city treasurer's office, indorsed it by writing his name there, and to have been paid the sum of twenty dollars therefor. Attached to this warrant was a receipt in the following form:

September 30, 1910.                              $20.00.
Received warrant No. 117 for the sum of $20.00 in full demand of the above amount.

                                      Richard Foley.

There was also testimony offered by the State tending to show that upon some doubt being raised as to the correctness of defendant's demand against the city for furnishing and keeping a horse, defendant took steps to make it appear that he had paid one Sheehan for the board of a horse at a livery stable owned by said Sheehan, and to this end defendant obtained from Sheehan receipted bills for the board of a horse covering the month of September, 1910, and for other months prior and subsequent thereto. Defendant also procured a bill of sale from said Sheehan, dated July 1, 1910, and purporting to sell to defendant a certain horse, therein described, for the sum of one hundred dollars. It was also shown that he procured certain bills for shoeing horses from one Hennessey, a horseshoer, purporting to cover the said month of September, 1910, and other months. It was shown that all of these documents were bogus and that the horse stated to have been sold to defendant was not so sold him; that the board was not furnished to him, nor was the horseshoeing done for him—the above acts being mere efforts on his part to evade an investigation and to make a showing of good faith to the officers of the city who were engaged in the inquiry.

Defendant being called before one B. J. Taussig, who at the time was comptroller of the city of St. Louis, sometime about the 23d of January, 1911, of-

fered the above named bogus receipts and bills with the purpose of explaining the charge against him. Later, and about the 3d of February, 1911, he again saw Taussig, and in the latter's presence and in the presence of A. J. Jacobs and E. J. Howes, made a voluntary confession touching the charge against him, being that for which he was subsequently prosecuted. This confession is as follows:

### STATEMENT OF RICHARD FOLEY,

Inspector, Supervisor of City Lighting.

Now gentlemen you have it on me and all that Mr. Howes has stated is the truth. I will answer any question you care to ask.

In June, 1909, my horse went lame and I let him go. I remember that we had just received our pay and Mc-Namara and I were going down the street and I told him that I had to go to East St. Louis to get me a horse and he suggested that we both use his horse and my buggy. I said that would be all right until I got a horse. It would give us a chance to charge the city for the keep of two horses and we could put the difference into our own pockets.

Both Jeremiah Sheehan and John Sheehan knew that we only had one horse between us. The bills were always made out on pay day for the keep of two horses; since June 1st, 1909, we have never had but one horse and they knew it. Sometimes John Sheehan receipted the bills and sometimes his father did so.

The first intimation that I had that there was liable to be an investigation was on the night of January 11th, 1911, when I was told by the desk operator to call up Mr. Flood as soon as I could. I did so and from his question as to whether or not I had a horse and buggy and the manner of his asking it I was sure that something was in the wind and McNamara and I arranged to meet that night down town. McNamara and I met on the night of January 11th, 1911, and talked the matter over and we notified one of the Sheehans to show up two horses as belonging to us if any one called to see him about it.

On the 12th of January, 1911, I went to the Sheehan barn about ten a. m., and found Jeremiah and John there; they told me that a short dark man had been there and that Jeremiah Sheehan had shown the black mare as belonging to me. The old man did the talking to me. He also stated that McNamara had been there that morning before I had.

That same day Mr. Jacobs, supervisor of city lighting, called McNamara and me to his office to get our state-ment. I told Mr. Jacobs that I had always owned a horse and buggy while employed in the lighting department. I told Mr. Jacobs that I had bought the black horse I used since that day, January 12th, 1911; that I had bought it from Jeremiah Sheehan sometime in June, 1910. I be-lieved that the matter had been dropped and only used the black horse once or twice until I was again interviewed by Mr. Howes. Since that time I have been using the black horse to make it appear that I had a horse. When Sheehan told me someone inquired about my horse, I said I guess we are up against it, Sheehan said "I guess it won't amount to anything." Jeremiah and John Sheehan both knew that we were defrauding the city of St. Louis.

I went to John Hennessy on January 25th, 1911, and I asked him to make me out a bill for six months shoeing for $12 and asked him to make it for the last six months although I did not owe him for any shoeing for any of these dates, but did owe him for an old shoeing bill way back. He well knew that I did not owe him for these months and he asked me what I wanted it for and I told him I thought there was an investigation on in our department pertaining to McNamara and myself and I wanted this bill to make it appear that I owned a horse.

I went to Jos. T. Troll about a week ago, I told him there was an investigation on in the office and told him if any one came to see him, to say that I gave him the horse last June and that he sold it for one dollar. I met him again a few days later, but he would not talk to me about this matter. I met him again the next day and he told me that he said what I asked him to, he then left me, and he and I met a few hours later on Broadway and Angelica, but there were others there and we didn't talk about the matter. I actually gave him a horse about June, 1909, a year earlier than I stated to you at the last meeting with you.

After McNamara and I had been to Mr. Jacobs' office the first time for an investigation we met, and wondered who gave it away, but we could not make it out; after that he came to me and said that he met Corcoran and that Corcoran said they were going to get us and Mc. said he would go and see Corcoran again and he thought he would tell him all he knew about it. Mc. then reported that Corcoran denied knowing anything about it, and said he never said anything against him in his life. After that we met Corcoran at the barn and I was inside and heard Mc. and Corcoran chewing the rag in the office. I would

not go into the office but heard Corcoran cursing us and heard him say he would fix us.

On the day that Mr. Howes met me at the office in the Commercial Building, room 420, I called Mc. up and told him that some newspaper man wanted to see me and he said that fellow was out here and then I went to Mr. Howes's office and I denied everything and claimed to have owned a horse all the time. Met Mc. that night, he said what did you say to that fellow and I answered I tried to deny it the best I could. I then told McNamara that I found bills made out to us jointly, he then said "that's hell that you should have that kind of bills." We said no more until we came to Mr. Taussig's office on the 30th of January, 1911.

That evening after leaving Mr. Taussig's office I met Mc. at the stable after making the rounds and we talked about it and told each other that Mr. Taussig had our bills. I told him I tried to deny everything the best that I could and told him I didn't think there was anything to do, they had the bills and everything against us. He was pretty blue and we didn't know what to do and we expected to be called any time again and we concluded Howes was no newspaper man and I said I wonder who is paying him. Mc. said I think Mr. Taussig will give us a square deal and I said I hope that he does. We meant that Mr. Taussig would give us the benefit of any doubt if it could not be proven we were guilty.

I wish to confess that Edward K. McNamara and I have been guilty of defrauding the city of St. Louis, Mo., in the sum of $400 by making false vouchers for two horses used in the city service where as a matter of fact we had but one horse between us, for a period of twenty months, beginning with June first, 1909, and ending January 31st, 1911.

I have made this confession voluntarily and no promise of immunity or protection has been made in any manner by any of the three men present at the signing of this statement, nor any other person for them. I have been warned that this statement may be used against me in any criminal proceeding that may be instituted concerning the matters herein stated.

Signed by me this 3rd day of Feb. 1911, at the office of the City Comptroller at the City Hall in St. Louis, Mo., in tne presence of Hon. B. J. Taussig, Arthur J. Jacobs and Earl J. Howes.

Witness·
{
B. J. Taussig.
A. J. Jacobs.
E. J. Howes.
}

Richard Foley.

The testimony on the part of the defendant showed that he had borne for many years a good reputation among those who knew him. Testifying in his own behalf he stated, in effect, that in the beginning of his employment he and McNamara were on duty at the same time and that he (defendant), though owning no horse, rented a horse and buggy; that later he bought a horse, which he used, and that during the period of his employment he had owned and used two horses. That later (elsewhere shown in the testimony to have been about June, 1909) the horse owned by him, having fallen and broken his leg, was given away, or rather sold by him for one dollar, and that subsequent to the disposal of this horse, and since the defendant and McNamara were on different watches, each of them would use the horse of McNamara, but that in making special trips and trouble calls he would use the street cars, as they were more convenient and rapid. Defendant stated also that he borrowed a horse from a friend, and when necessary, hired one from said Sheehan, and that "there was no time during his employment that he did not have a horse at his command if he needed one." He admitted upon the trial that he collected the twenty dollars in question for September, 1910, and similar sums for other months, which he used in paying his bills for car fare, for horse hire and in paying McNamara for the use of the latter's horse.

Upon the trial defendant was cross-examined by the State, over the objections of defendant's counsel, touching a great number of things not adverted to in defendant's examination in chief.

At the close of all the testimony defendant offered a demurrer to the evidence in the form of a requested instruction to the jury that they should find him not guilty.

The court gave, among others, instruction numbered 1, which is as follows:

"The State dismisses the charge as contained in the first count of the indictment, and you will therefore only consider the charge as contained in the second count of the indictment.

"If you believe, and find from the evidence in the case that the defendant, Richard Foley, on or about the 30th day of September, 1910, at the city of St. Louis, aforesaid, was an inspector of city lighting, duly appointed and qualified and acting under and by virtue of the laws and ordinances of said city of St. Louis, a municipal corporation, and that he, on or about the 30th of September, 1910, at the city of St. Louis and State of Missouri, unlawfully, feloniously, knowingly and designedly, with the intent to cheat and defraud the city of St. Louis, a municipal corporation, did feloniously and fraudulently represent, pretend and state to the said city of St. Louis, its officers, agents and servants, that he owned a horse and buggy, and had used the same in the city's service during the month of September, 1910, and that the city of St. Louis was justly indebted to him in the sum of twenty dollars for furnishing and keeping a horse and buggy, which he used in the said city of St. Louis in performing his duties during the said month of September, 1910, and that he was entitled to receive and have from the city of St. Louis the sum of twenty dollars for furnishing and keeping a horse and buggy used by him as inspector in the performance of his duties as such inspector of said city of St. Louis during the month of September, 1910, and that the city of St. Louis, its officers, agents and servants believing such false pretenses and representations, so made by said defendant, to be true and being deceived thereby were then and there induced by the said false representations and pretenses to pay over and deliver to the said Richard Foley, inspector as aforesaid, and did pay over and deliver to the said Richard Foley the sum of twenty dollars, lawful money of the United States, in

full payment and in discharge of said indebtedness the twenty dollars, represented as aforesaid to be due and owing by said city of St. Louis to said Richard Foley, and that the said Foley by means of said false pretenses and representations so made to the city of St. Louis, aforesaid, unlawfully, feloniously, knowingly and designedly did then and there obtain of and from the city of St. Louis said twenty dollars, lawful money of the United States, the personal property of said city of St. Louis and of the value of twenty dollars, with the intent then and there the said city of St. Louis to cheat and defraud of the same; and

"Whereas in truth and in fact the said Richard Foley, inspector as aforesaid, did not on or about the 30th day of September, 1910, own a horse and buggy and did not use the same in the city's service during the month of September, 1910; and in truth and in fact the said city of St. Louis was not then and there justly indebted to him in the sum of twenty dollars for furnishing and keeping a horse and buggy which he, the said Richard Foley, as such inspector used in said city of St. Louis in performing his duties through said month of September, 1910; and in truth and in fact the said Richard Foley, inspector as aforesaid, was not then and there entitled to receive and take from the said city of St. Louis the sum of twenty dollars for furnishing and keeping a horse and buggy, used by the said Richard Foley in the performance of his duties as such inspector in said city of St. Louis during the month of September, 1910, all of which he, the said Richard Foley, then and there well knew, you will find the defendant guilty of obtaining money under false pretenses, as charged in the second count of the indictment, and fix his punishment at imprisonment in the state penitentiary for any length of time not less than two nor more than seven years. Unless you

find the facts to be as stated above, you will acquit the defendant.

"The court instructs you that the word 'feloniously,' as used in the indictment and in these instructions, means wickedly and against the admonition of the law."

The defendant, by his counsel, excepted to each of the instructions given by the court "for the reason that each and all state the law with reference to this cause and the evidence herein incorrectly and erroneously; because said instructions are not complete and full expositions of the law in the cause under the evidence; because the jury in such instructions are not fully nor adequately advised of all the law under the evidence, necessary to their reaching a verdict in the cause."

At the request of defendant the court gave in his behalf instruction number 5, which is as follows:

"The court instructs the jury that under the ordinances of the city of St. Louis and the orders given the defendant by his superior, it was not required of the defendant that he own a horse and buggy but simply that he provide a horse and buggy for use in connection with his work as a city lighting inspector, and the jury are further instructed that if they believe from the evidence that the defendant did so provide a horse and buggy, it is immaterial who was the actual owner of said horse and buggy or whether the defendant did or did not own the same. And if the jury believe from the evidence that the defendant did so provide a horse and buggy, then it becomes the duty of the jury to acquit the defendant."

The above statement would seem to present sufficient of the facts for a clear understanding of the questions before us; in such respects as the statement may be in this behalf defective, it will be eked out by a reference to the facts in the subjoined opinion.

## OPINION.

In addition to the defendant's contention, as set out in his motion to quash, of the lack of sufficiency of the indictment, he urges many other alleged errors in his motion for a new trial. The matter of the sufficiency of the indictment, since it is a part of the record, we must notice, though no motion in arrest is filed. But we are not required to go outside of the assignments of error as contained in the motion for a new trial, even in a criminal case, so far as matters of pure exception, not contained in the record proper, are concerned. [State v. Gilmore, 110 Mo. 1; State v. Headrick, 149 Mo. 404; State v. Harlan, 130 Mo. 394; State v. Alred, 115 Mo. 471.]

Matters Considered on Appeal.

Turning then as a guide to the motion for a new trial, and passing for later and further examination the alleged lack of sufficiency of the indictment, we find defendant complaining that (a) there was not sufficient nor the necessary evidence to warrant the verdict of the jury, and that the verdict was against the law and the evidence; (b) that the court erred in refusing to give a peremptory instruction to acquit defendant; (c) that the court erred in admitting incompetent, irrelevant and improper evidence on the part of the State, and (1), specifically, that it was error on the part of the State to offer and on the court to admit other vouchers, warrants and things having no relevancy to the charge in hand, and no tendency to prove the instant charge; (2) that the State in cross-examining defendant went beyond the legitimate bounds of his examination in chief; (d) that the instructions of the court were erroneous and incorrect expositions of the law applicable to the case, and (e) that the court failed to fully and completely instruct the jury upon all the law in the case, and to give to the jury all such instructions as were

Errors Assigned.

necessary to enable the jury to reach a just and proper verdict. These in their order.

I. We are confronted *in limine* by the objection that the indictment is not sufficient in law. An examination and analysis of this indictment discloses that it charges ''that Richard Foley . . . was an inspector of city lighting, duly appointed and qualified and acting; . . . that about the 30th day of September, 1910, at the city of St. Louis aforesaid [he], unlawfully, feloniously, knowingly and designedly with the intent to cheat, . . . the city of St. Louis, did falsely and fraudulently represent to the city of St. Louis, its officers . . . that . . . defendant owned a horse and buggy; . . . that he used same in the city's service (during said month); that said city of St. Louis was justly indebted to defendant in the sum of twenty dollars for so furnishing . . . said horse and buggy, . . . which he used . . . in performing his duties during said month of September, 1910, . . . ; that he was entitled to have and receive from said city . . . the sum of twenty dollars for furnishing a horse . . . used by said Richard Foley . . . ; that the city, its officers . . . believing said false pretenses and representations so made . . . to be true, . . . being deceived thereby, . . . were induced to pay over and deliver . . . and did then and there pay over and deliver to said Richard Foley . . . certain personal property, to-wit, twenty dollars, lawful money . . . in full payment . . . of said indebtedness . . . represented as aforesaid to be due . . . to said Richard Foley . . . ; that said Richard Foley . . . by means of the said false pretenses . . . made to the city of St. Louis, . . . unlawfully, feloniously, knowingly and designedly did . . . obtain of and from the city . . . twenty dollars, lawful money, . . . the personal property of the said city . . . of the value of twenty dollars,

<span style="margin-left:0">**Sufficiency of Indictment.**</span>

with the intent . . . the said city, . . . to cheat and defraud of the same." Thereupon follow certain clauses negativing the truth of the alleged statements and representations charged to have been made by defendant. Clearly, whatever else may be offered in criticism of the legal goodness, of this indictment, it cannot be urged that it is erroneous because it is too brief.

We have set out in skeleton the allegations which are made in the indictment, and we find them to be in substance those which are, by the adjudicated cases in this State, and under our statute, required to be made. Nor do we find any material averment lacking. [Consult State v. Phelan, 159 Mo. 122; State v. Hubbard, 170 Mo. 353; State v. Saunders, 63 Mo. 482; State v. Kelly, 170 Mo. 151; State v. Vandenburg, 159 Mo. 230; State v. Clay, 100 Mo. 571; State v. Feazell, 132 Mo. 176; State v. Turley, 142 Mo. 403; State v. Dines, 206 Mo. 653; State v. Roberts, 201 Mo. 710.] It is scarcely possible, the nature of the offense considered, to find any adjudicated case, and *ergo,* any hard and fast form of indictment, similar in all respects to, and in all ways on all-fours, with any other case, or indictment. The most that we might expect to find is here a stone and there a stone, either taken or rejected by the builders. Measured by the requirements of the statute, as well as by the holdings of the cases, all of the legal averments required are found in this indictment.

The defendant complains further, however (as we read his motion to quash), that since he was an inspector of city lighting, holding employment under an appointment from the city, the ordinance **Pleading Ordinance.** of the city under which he held office, and by virtue of the provisions of which he was put in a position to carry out the fraud which he perpetrated, should have been pleaded. We cannot agree to this view. The statute under which the prosecution

was had, covers the false pretences of all persons, whether officers, city employees, as defendant was, or private persons, who by their acts run afoul of its denunications. [Sec. 4565, R. S. 1909.] If the statute violated had been such that its provisions could be violated by an officer or employee of a city or other municipality only, then there might be some basis for this somewhat unique contention.

Defendant also specifically urges that the alleged false representations made by defendant, as the same are disclosed by the indictment, were touching matters and things fully within the knowledge of the identical officers of the city who are said to have been deceived thereby. If this is true, then the indictment is bad, for the law which lays down this rule is almost fundamental. What was the gravaman of the false pretense? Clearly, to use the words of defendant, that "*I own a horse and buggy and that I have used the same for the city's service during the month of September,* 1910." The truth or falsity of this is a question of fact not in anywise different from the question which always comes up to be decided by any other victim of a false pretense. How could the city officers have known the falsity of defendant's statement? What further or greater source of knowledge was open to them than would have been open to any private citizen? He made representations, resting on facts, *in pais,* which were known to him to be false, which could have been found by the city officers to be false only after a long investigation, which in the last analysis would have involved the proof of a negative, never, by its very nature, the most convincing proof. If a victim of an alleged false pretense were to be required, as a condition precedent to a prosecution, to have sounded the ultimate depths of investigation before parting with his property, then any prosecution of any false pretense would become wellnigh impossible. As long as business matters are

<small>Known Falsehood.</small>

transacted between men, some faith and credit must be given to what men say and write, and they must be held to some measure of responsibility for their truth —speaking, *a fortiori,* where the matters said or written, are, as here, peculiarly within the breast of the speaker or writer. We hold, therefore, that the indictment is good.

II. Defendant urges that the evidence was not sufficient or of the necessary sort to warrant a conviction. We are precluded, as a court of errors, from passing on this question if there be any substantial proof of guilt. Present substantial proof, either direct or circumstantial, of each and every **Sufficient** legal element entering into and necessary in **Evidence.** law to make out the offense charged, the weight and credibility of the evidence was for the jury, as the triers of fact. Certain elements are recognized as necessary in making out in law every crime, whether at common law or under a statute; unless there is some substantial evidence of each and every such element, of necessity the case falls. There is no such lack in the case at bar. The jury had before them the written statement of defendant that he "owned a horse and buggy and that he used the same in the city's service during September, 1910." They had his confession, fully corroborated by divers other facts and witnesses, admitting the falsity of his above quoted statement. If the jury believed his confession and this evidence (it was within their province so to do, or not to do) they might well have found as they did find.

III. Contention is also made that the court should have directed an acquittal at the close of all of the evidence. It does not clearly appear upon what specific ground defendant urges this view. If it is based on the mere insufficiency of the evidence, we hold above that this objection is not tenable. If this contention be bottomed (as defendant's brief suggests,

*apropos* of no other clear point) on the action of the
court in taking the first count from the
Dismissal as     jury, and upon the argument that since
to One Count:    .the essence of one count was likewise the
Effects.         essence of the other, a dismissal (tanta-
mount to an acquittal) on the first count operated as
an acquittal on the second, then we apprehend learned
counsel is mistaken as to the holding in the cases of
State v. Hess, 240 Mo. 147; State v. Headrick, 179 Mo.
300; and State v. Brotzer, 245 Mo. 499, which he cites.

The case of State v. Brotzer, supra, was a prose-
cution in three counts for injuring the wires of a tele-
phone company. The dates of the offenses were laid
on February 2, 8, and 10, respectively. After the
jury was sworn and jeopardy had attached, the State
entered a *nolle prosequi* as to those counts which laid
the offense on the 8th and 10th of February. The
court below was requested to instruct, but refused to
instruct the jury that since a *nolle prosequi* had been
entered as to those counts charging the offense to have
been committed on the 8th and 10th days of February,
the two latter days could not be considered by the
jury, for as to the offenses on those days defendant
stood acquit. Held error, to refuse such instruc-
tion.

The case of State v. Headrick, supra, has been
correctly and aptly epitomized by Brown, J., in the
other case cited by counsel (State v. Hess, supra):
"The case of State v. Headrick, 179 Mo. 300, does not
sustain the theory of defendant. In the Headrick case,
both counts of the indictment charged exactly the same
offense, to-wit, assault with intent to kill; and it was
held that a verdict finding the defendant, not guilty
under one count and guilty under the other, could not
stand. Here, we have a different situation. The
charge of burning the goods with intent to defraud
the insurance companies was a different accusation

from the ordinary charge of arson in burning the same property without intent to defraud.''

If the first count in the instant case had charged precisely the same offense, perpetrated, or so charged to be, by identically the same means, there would be a fair basis for defendant's contention. For there is one well-considered case in this State which so holds. He is charged in the first count with obtaining a ''warrant of the value of twenty dollars,'' and in the second count with obtaining ''twenty dollars, lawful money of the United States.'' The rule contended for by defendant would have the inevitable effect of precluding a pleader in a murder case, where the cause or means or the instrument of death is in doubt, from charging on more than one count. The well-settled practice is otherwise, and cases need not be cited to support it.

Defendant's learned counsel strenuously urges that there is a variance between the charge as contained in the second count and the proof adduced to support this charge; in that, defendant was indicted for obtaining ''twenty dollars in lawful money of the United States,'' while the proof showed that he obtained a ''warrant on the city treasurer of the city of St. Louis of the value of twenty dollars.''

<span style="margin">Variance.</span>

It may well be doubted, whether upon the facts in evidence, this contention has any merit. The testimony shows that the voucher (called by some of the witnesses, and in the first count of the indictment, a ''warrant'') was prepared in the office of the city auditor; there stamped ''City Auditor's Office, surrendered;'' that the voucher, with the receipt appended was then passed by the auditor's office to the office of the city treasurer, where the defendant called when he came to be paid; that he signed the appended receipt, wrote his name in the form of an indorsement on the back of the voucher, and got the twenty dollars in question. The voucher was paid on the same day it

was issued, for it was stamped "City Treasurer's Office, September 30, 1910, St. Louis, Missouri." After payment the voucher was returned to the auditor's office and filed, being stamped, "Paid and filed, October first, 1910, W. R. Hodges, Auditor." The testimony of the deputy city auditor, Claud B. Benton, lends some weight to the supposition that payment was made by the auditor's office without any physical delivery of the voucher to defendant, other than for the mere purpose of having him write his name as an indorsement thereon. For he says: "This stamp (referring to the words 'city auditor's office, surrendered') is put on by us *when we surrender this voucher, or when we pay it, in other words.*"

From these facts, we are impelled to the conclusion that the delivery of the voucher to the defendant, if it was ever physically delivered to him, was but a mere detail of the manner in which he obtained the twenty dollars in question. That it all was, in a sense, but a part of the *res gestae.*

But, however that may be, we need not speculate. If defendant was prejudiced, such hurt accrued to him by reason of a variance. The statute requires that matters of alleged variance shall be called to the attention of the trial court. [Sec. 5114, R. S. 1909.] This was nowhere done by defendant. He raises this objection for the first time in his brief. Throughout the record by his objections, he not once raises this point, nor does he advert to it in his motion for a new trial. In order to rely upon the point here, it was incumbent on defendant to call the matter of the alleged variance to the trial court's attention. [State v. Ballard, 104 Mo. 637; State v. Dale, 141 Mo. 284.] Having neglected so to do, we are not bound to consider it now, the more so, since we cannot find from the facts that defendant's rights were prejudiced by reason of the alleged variance, when we look at the whole evidence in the case.

IV. Defendant insists (1) that it was error to admit proof of his having obtained payments for months other than the month of September, 1910, and that the admission of warrants, or vouchers, evidencing other fraudulent payments, prejudiced him. That the general rule is as learned counsel con-

**Kindred Fraudulent Acts.** tends, there is no doubt. Proof of other crimes is, as a rule, not admissible. [State v. Turner, 76 Mo. 350; State v. Young, 119 Mo. 495; State v. Taylor, 136 Mo. 66.] But there is in law a well-known class of cases which, being exceptions, fall outside of the rule. This prosecution is within the exception, and testimony and evidence of similar acts, done in the same town, though at different times, may be shown for the purpose of showing the intent with which the act charged was done. [State v. Bayne, 88 Mo. 604; State v. Myers, 82 Mo. 558; State v. Turley, 142 Mo. 403; State v. Rosenberg, 162 Mo. 358.]

If it be said that proximity in time of the other acts of similar sort shown, take the instant case out of the rule, the answer might well be that defendant is here shown to have been guilty of the same offense each time an opportunity presented itself.

(2) It is strenuously contended that the State was permitted to go far outside of the examination in chief of defendant in cross-examining him. The record discloses that this is true. The wholly unnecessary extent to which this was allowed in

**Cross-Examination of Defendant.** this case makes this contention a serious one. This was, under the facts here, inexcusable, because the matters *dehors* defendant's examination in chief about which he was cross-examined had been abundantly shown by Hennessey and Sheehan and other witnesses for the State. The signed confession of defendant also shows the identical facts fully and in all their details. On his cross-examination defendant was asked these questions.

"You went down to Hennessey's and got this bill here, which has been shown?

"You also handed Mr. Taussig this bill for the purchase of a black horse from Mr. Sheehan?

"You did tell Mr. Troll, along about January, that in the event that he was questioned about when he got the horse, to say it was in June, 1910?"

To these questions, and others of similar sort, defendant was compelled to answer, over the timely and proper objections of his counsel.

All of these matters are fully, at length and in detail set out in the signed confession of the defendant. He had, in his examination in chief, been asked fully as to his duties; his hours of labor; his ownership of horses; his hiring of horses from Sheehan and Keator; his loss of a horse in June, 1909, by the breaking of a leg; his borrowing of or joint use of a horse with McNamara; finally, being asked: "Q. Was there any time during your service that you didn't have a horse at your call and use? A. No, sir." Relative to matters occurring at the time of his making the confession offered, defendant was asked in his examination in chief:

"Q. Finally, they brought you up one day to Mr. Taussig's office? Do you remember going there the second time? A. Yes, sir.

"Q. Who was up there? A. Mr. Taussig, Mr. Jacobs and Mr. Howes.

"Q. The man who was sitting here the other day? A. Yes, sir.

"Q. What occurred up there—I will ask you first what watch you were on at that time? A. The evening watch.

"Q. Well, what occurred up there? A. They called me in and asked me in regard to my horse—to provide a horse for the city.

"Q. Who asked you? A. Mr. Howes.

"Q. Did anybody else ask you any questions? A. Yes, sir; Mr. Taussig and Mr. Jacobs.

"Q. How long did that inquisition last?

"Mr. Rudolph: I object to that, your Honor.

"Mr. Gernez (resuming examination): Q. How long did this inquisition last. A. About five or six hours.

"Q. And at the end of it, this written statement, this typewritten statement was drawn up? Who drew that statement up? A. I believe Mr. Jacobs and Mr. Howes were both writing on it.

"Q. You saw it done? A. One would ask me a question and the other would copy it down, and then the other would ask me a question and the other would copy it down.

"Q. Did you use this language that is in here: 'I wish to confess that E. K. McNamara and I have been guilty of defrauding the city of St. Louis of the sum of four hundred dollars? A. No, sir, I never said that.

"Q. Who put that in there? A. I don't know.

"Q. Did you ever use this: 'I have made this confession voluntarily,' in that language? A. No, sir.

"Q. Who put that in there? A. No, sir, I don't know that.

"Q. Did you read it? A. I glanced over it, but I never read it.

"Q. What hour was this finished? A. About eleven o'clock at night.

"Q. You got up there about five o'clock and stayed in there about six hours? A. Yes, sir.

"Q. Had you had any sleep the night before? A. No, sir.

"Q. And under those circumstances, you signed that paper? A. Yes, sir; that is right."

It will be seen that defendant was questioned as to the things done at the meeting of himself with

Howes, Taussig and Jacobs; this being the meeting at which the confession was obtained. He was also asked as to the language used by himself and others; he denied many things, which he had admitted in his confession; he explained, by a sort of verbal *molliter manus imposuit,* other things there done and said. In his examination in chief he was, as will be noted, twice asked by his counsel the broad question, *"What occurred up there?"* It is true he did not answer this fully and in detail, but he told many facts which are set out in his confession, and which were testified to also by Taussig, Jacobs and Howes, as occurring; and denied others stated by Howes, Taussig and Jacobs, and in his confession, as occurring there. His confession was, under the facts, for the jury to weigh. The matters complained of as being *dehors* his examination in chief are all set out fully in that confession. Can he be asked by his counsel *"to tell what happened there;"* actually tell part of it, and then take refuge in the statutory privilege? We think not. The State need not categorically follow what was said in his chief examination. [State v. Miller, 156 Mo. 76; State v. Fisher, 162 Mo. 169; State v. Punshon, 133 Mo. 44; State v. Avery, 113 Mo. 475; State v. Myers, 221 Mo. 598.] Besides, under all the facts it is difficult to see wherein his rights were prejudiced before the jury by these questions and his answers, though we concede that they were unnecessary and uncalled for. He was given an opportunity to explain and put his own construction on what was done and said, and upon what he had himself said, in his confession.

If his case was not prejudiced by his answers, the action of the court was not reversible error. [State v. Brooks, 92 Mo. l. c. 582; State v. Beaucleigh, 92 Mo. 490; State v. Douglass, 81 Mo. 231.] Nor can defendant complain if he opened the door for these questions by his chief examination, or if (as we think) they were necessarily embraced in such examination

in chief. [State v. Myers, 221 Mo. 598.] We hold upon the facts here that this point should be ruled against defendant.

V. The further contention is made that the instructions of the court were "erroneous, inconsistent and diametrically opposed to each other." We are not furnished with detailed specifications showing the precise basis for the error alleged. We gather from the record, that, since instruction one given for the State recites the false representation of defendant as being that "he owned a horse and buggy and had used the same in the city's service during the month of September, 1910," while the instruction given for defendant on his own request, says "it was not required of the defendant that he own a horse and buggy, but simply that he provide" same, and if the jury believed "defendant did so provide a horse and buggy," ownership thereof was not material, and that the jury should acquit defendant, thus arise his contentions. Was there error in this? We think not. The court followed in instruction one the very language defendant used in making the alleged false representations. Can he complain of the use of the identical words which he, by his acts and his words, put in the court's mouth? He might well have objected, as no doubt he would have done, had the court used any other words than those in which the representations were couched. His own language quoted in instruction one was defined in the instruction given for defendant, as being susceptible of a meaning not involving criminality. The jury was told in effect that even if defendant had falsely represented that he owned a horse and buggy, yet if he had furnished and used a horse and buggy belonging to others, this fully met the intention and spirit of the law and he should go acquit. In the view we take of

*Conflicting Instructions.*

these instructions defendant has no ground of complaint.

Other minor complaints have been fully examined, and finding nowhere in the case reversible error, we are of opinion the case should be affirmed, and it is so ordered. *Brown, P. J.,* and *Walker, J.,* concur.